**Barney REIFFEN and Constance Reiffen**
**v.**
**The UNITED STATES.**
**No. 403-64.**

United States Court of Claims.
May 12, 1967.

Burton L. Williams, Boston, Mass., attorney of record, for plaintiffs. John M. Barnes, Jr., Boston, Mass., of counsel.

Michael I. Sanders, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Roald A. Hogenson with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on February 2, 1967. Plaintiffs have filed no exceptions to or brief on this report and the time for so filing pursuant to the Rules of the court has expired. On March 16, 1967, defendant filed a motion that the court adopt the trial commissioner's findings of fact, opinion and recommended conclusion of law, to which plaintiffs have filed no response. Since the court agrees with the trial commissioner's findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Plaintiffs are, therefore, not entitled to recover and the petition is dismissed.

OPINION OF COMMISSIONER *

HOGENSON, Commissioner:

This is a suit for recovery of Federal individual income tax paid by plaintiffs, husband and wife, on their joint return filed for the calendar year 1960. The issue is whether payments to plaintiff Barney Reiffen by Lincoln Laboratory of Massachusetts Institute of Technology, from January 1 through August 31, 1960, during which time he was a graduate student at M.I.T., were excludable from his gross income as a scholarship or a fellowship grant under section 117 of the Internal Revenue Code of 1954, or whether such payments were properly included in plaintiffs' return as gross income under Treasury Regulations § 1.117–4(c) (2) as amounts received by him to enable him to pursue studies and research primarily for the benefit of the grantor, or as compensation for past, present or future employment services. After a full review of the record and upon consideration of the legal authorities cited by the parties and their respective requested findings of fact and briefs, it is my opinion based upon the following detailed and ultimate findings of fact and recommended conclusions of law, with citations to leading cases, that plaintiffs are not entitled to recover and that their petition should be dismissed.

### FINDINGS OF FACT

1. Plaintiffs, Barney and Constance Reiffen, are husband and wife, residing at Lexington, Massachusetts. They timely filed their joint Federal income tax return, on the cash basis of accounting, for the calendar year 1960, and paid the $1,313.16 tax shown thereon by application of amounts previously collected as payroll deductions for Federal income tax purposes.

2. On December 30, 1963, plaintiffs duly filed with the District Director of Internal Revenue, Boston, Massachusetts, a claim for refund of the 1960 tax to the extent of $1,250.97, asserting the

same reasons therein as are now alleged by them in this timely suit for recovery of the same amount.

3. On November 27, 1964, when plaintiffs' petition was filed herein, the Internal Revenue Service had not acted on the claim for refund.

4. The sum of $1,250.97, claimed by plaintiffs, is that portion of the 1960 tax paid by them, which is attributable to the inclusicn in plaintiffs' gross income of $5,790 received by plaintiff Barney Reiffen (hereinafter called plaintiff) during the period January 1, 1960, through August 31, 1960, from the Lincoln Laboratory of the Massachusetts Institute of Technology.

5. Plaintiff had been a practicing electrical engineer since 1951. He graduated from Cooper Union with a B.E.E. degree (Bachelor of Electrical Engineering) in 1949; from Polytechnic Institute of Brooklyn with an M.E.E. degree (Master of Electrical Engineering) in 1953; and from Massachusetts Institute of Technology with a Ph.D. degree in electrical engineering on September 21, 1960. From June 1951 through May 1953 he was employed by Harvey-Wells Electronics, Inc., as an electrical engineer. He was head of the Development Section of Balco Research Labs. from June 1953 to May 1955. Since then, he has been continuously on the staff of Lincoln Laboratory (hereinafter Lincoln) either as a staff member or as a staff associate, as related infra.

6. Lincoln is and was operated under contract by the Massachusetts Institute of Technology (M.I.T.) for the United States Army, Navy, and Air Force. Lincoln is located at Lexington, Massachusetts, about 10 miles from the M.I.T. campus at Cambridge, Massachusetts. M.I.T. is an educational institution which maintains a regular faculty and curriculum and has a regularly organized body of students in attendance at the place where its educational activities are carried on. The work of Lincoln consists of

---

* The findings of fact and recommended conclusions of law are submitted under the order of reference and Rule 57(a).

programs undertaken in response to requests of Government agencies whose needs coincide with the laboratory's areas of competence, as well as a program of general research. The laboratory is engaged in research and development oriented primarily toward the communications and electronics required in the defense of North America against air attack. The technical program includes electronic and solid state research, component engineering, radar development, microwave studies, investigations of communications and data processing techniques, studies on digital computers, equipment engineering, and systems development.

7. Communications research is directed toward the central problem of providing long distance, reliable military communications. Lincoln's pioneer research and development work in tropospheric and ionospheric scatter communications, now widely used, is continued in studies of orbital scatter communications by means of passive repeaters, such as orbiting dipole belts. Other areas of research include active satellite repeaters, wide-band communication to deep-space probes, reliable and secure long distance strategic circuits, and the application of communication theory and information processing logic to obtain economical transmission of very high volumes of data at very high rates.

8. Staff appointments to Lincoln are made as conditions require with the appointees attached to the laboratory rather than to any academic department. Compensation must conform to the approved scale. Staff appointments do not carry academic privileges such as tenure, regular graduate student status, academic vacations, or consulting privileges.

9. From June 6, 1955, through September 14, 1958, plaintiff was employed as a full-time staff member at Lincoln, and in his assignment to Group 311 until January 16, 1958, and thereafter to Group 25, he engaged in research on filter design, frequency assignment problems and communication system design, and participated in the preparation of technical reports on research concerning information and communication theory within the general domain of processing and transmission of information.

In the latter part of his above-mentioned service as a staff member, plaintiff applied and was accepted on March 26, 1958, to become a staff associate in Lincoln's Staff Associate Program.

10. From September 15, 1958, through August 29, 1960, plaintiff was a staff associate under the Staff Associate Program, during which time he qualified for his Ph.D. degree from M.I.T., and then resumed his status as a staff member at Lincoln, thereafter was advanced on August 28, 1961, to Associate Group Leader of Group 25, transferred with the same title to Group 65 on April 1, 1963, and finally became Group Leader of Group 66 at the laboratory.

11. At the outset of his employment by Lincoln on June 6, 1955, plaintiff executed an invention agreement, which has remained effective throughout his association with Lincoln, that he would assign all of his inventions in connection with the work on which he was employed, and all patents and applications relating to them, to M.I.T. He expressly acknowledged in such agreement that the making of such inventions and transferring them to M.I.T. was an important part of the work for which he was employed in the laboratory of Lincoln, and expressly accepted his employment with that understanding.

12. The Staff Associate Program was created by Lincoln about 1955 to enable Lincoln to compete with industry and other organizations (such as Westinghouse, Hughes, General Electric and Stanford Research Institute) in the recruitment, training and retention of scientific and professional personnel to be employed in the operation of the laboratory. There was a shortage of technical talent, and the large employers of professional engineering and scientific people were operating or organizing similar programs of recruitment and training.

13. Lincoln's Staff Associate Program on the doctorate level was a 2-year

program in which the chosen staff associate spent the first academic year (September to June) as a research assistant on the staff of M.I.T.'s Research Laboratory of Electronics, Department of Electrical Engineering, on the M.I.T. campus, and the second academic year as a full-time graduate student at M.I.T. During the intervening summer, such staff associate was required to work full time in a regular group at the Lincoln Laboratory. To be a staff associate, the individual must first be an employee at Lincoln, at least for the summer months immediately before the start of the first academic year.

14. In accordance with the Staff Associate Program, plaintiff served as a research assistant in the Research Laboratory of Electronics (R.L.E.) on the M.I.T. campus from September 1958 to June 1959, was provided a desk and an office, and was directly responsible to Professor Zimmerman of that laboratory. During that period, he was paid $550 per month by Lincoln. In the period immediately preceding his research assistantship, his salary at Lincoln had been $965 per month, where he had worked a 40-hour week. His research assistantship at M.I.T. was a full-time staff position requiring about 40 hours of work per week, minus time for class attendance. He was permitted to study for his advanced degree at the rate of two subjects per term, and paid tuition to M.I.T. at the special staff member rate of $210 per term. Plaintiff's research activities at R.L.E. were with a group assigned to the work area designated as "Processing and Transmission of Information." His work was in one phase of a research project conducted by R.L.E., supported by Lincoln's Purchase Order DDL–B–222 issued to R.L.E., which had been extended through the period July 1, 1958, to June 30, 1959. Plaintiff worked in the part of the project entitled "Theoretical and experimental investigations of coding problems with emphasis on coding for reliable transmission through the ionosphere and on telephone lines." He participated in the preparation of his

group's part (Processing and Transmission of Information) of R.L.E. quarterly progress reports, and in the one dated January 15, 1959, authored the section entitled "Information Loss Associated with Decision-making in Additive Gaussian Channels," and in the report dated April 15, 1959, "The Capacity of a Multiplicative Channel." Funds to support this research were provided to Lincoln by the Army, Navy, and Air Force under Government contracts AF 19(122)–458 and AF 19(604)–5200.

15. During the summer of 1959, plaintiff was employed on a full-time basis at the Lincoln Laboratory, and was paid by Lincoln at the rate of $965 per month.

16. For the academic year commencing in September 1959, plaintiff was a full-time student at M.I.T., completed the required study and research for his doctorate, and his thesis "Sequential Encoding and Decoding for the Discrete Memoryless Channel" was approved and thereafter published on August 12, 1960, as Research Laboratory of Electronics Technical Report 374 and Lincoln Laboratory Technical Report 231. The inside cover of this thesis report carried the statement that the "work reported in this document was performed at Lincoln Laboratory, a center for research operated by Massachusetts Institute of Technology with the joint support of the U.S. Army, Navy, and Air Force under Air Force Contract AF 19(604)–5200."

During the period mentioned in this finding, plaintiff was paid by Lincoln at the rate of $723.75 per month (75 percent of his $965 per month salary at Lincoln), and Lincoln also paid plaintiff's tuition at M.I.T., all as had been agreed between plaintiff and Lincoln when he was accepted for the Staff Associate Program.

17. R.L.E. regularly performed various research services for Lincoln. Under various contracts with M.I.T., Lincoln had the authority to determine the nature of the instruction and training given to a staff associate under the Staff Associate Program.

18. No promise was exacted from a staff associate that he return to Lincoln to be employed as a staff member after receiving his degree. Occasionally, a staff associate, upon completion of the Staff Associate Program, obtained a position elsewhere. With its prestige as part of M.I.T., and because of the prime importance of its research activities under Government sponsorship, it was the hope of the administrators of Lincoln that each staff associate would complete his academic work as soon as possible and then return to Lincoln as a full-time staff member. In fact, if an applicant for admission to the Staff Associate Program indicated to Lincoln that after completion of the program, he was not going to return to Lincoln, such statement would have tended to bias the selection committee against accepting the application. In this regard, Lincoln's policy was to appoint an individual employee as a staff associate, continue him in an employment status with expectation that he would remain an employee after completion of the Staff Associate Program, exact no obligation that he continue as an unwilling employee, but permit him to leave Lincoln by resignation.

19. As stated above, the Staff Associate Program was financed by funds provided by the Army, Navy, and Air Force under contract AF 19(122)–458 with the Air Force. This contract incorporated Government contract AF 18 (600)–242, which prescribed allowable costs for research and development contracts with educational institutions, and by reference to the Armed Services Procurement Regulations, allows salaries and wages, overhead, equipment costs, costs of purchase orders and subcontracts, and others, but makes no mention of "fellowships," although tuition is recognized as an allowable cost. In the administration of the Government contract with Lincoln, Lincoln was reimbursed the funds expended under its Staff Associate Program either as salaries and wages or indirect costs under overhead, but no category of scholarships or fellowships was ever mentioned in the presentation or allowance of reimbursable costs. Defendant's contracting officer was fully informed of the Staff Associate Program, knew that a staff associate would spend an academic year as a full-time student at M.I.T. without performing work at Lincoln, and without any requirement that he return to Lincoln thereafter.

20. As in the case of plaintiff, each staff associate was retained on the payroll at Lincoln at a base salary figure, which was $965 per month for plaintiff. This was determined on the basis of the individual's ability, previous training, experience, and maturity. By consideration of the same factors, the base salary was reduced during the academic year in which the staff associate was a research assistant at R.L.E. (to $550 per month in plaintiff's case). The average pay of a research assistant at R.L.E. was about $275 per month. To allow a greater rate of pay, special approval had to be obtained from Lincoln's fiscal office which was done in plaintiff's case. Lincoln's accounting records were kept separate and apart from those of M.I.T. In the second year of the program, a higher percentage of the base salary was paid to the staff associate as a full-time student at M.I.T. ($723.75 per month to plaintiff). Payments to a staff associate were fixed without regard to his financial needs. While engaged in full-time work at Lincoln, staff associates were paid salaries commensurate with those of other laboratory staff members.

21. As in the case of all staff associates under the Staff Associate Program, the amounts paid by Lincoln to plaintiff as a staff associate were billed to the Government as salary in the same manner as for staff members. Staff associates were paid by checks issued by Lincoln's fiscal office which was disassociated from M.I.T.'s accounting and payroll office.

Lincoln withheld Federal income tax and the employee's share of social security taxes from all payments it made to both staff members and staff associates, paid the employer's share of social

security taxes thereon, and reported all of such payments as gross wages on the W–2 forms filed with the Internal Revenue Service, including as gross wages the M.I.T. tuition paid by Lincoln for plaintiff during the second year of his Staff Associate Program.

22. Prior to, during, and after plaintiff's participation in the Staff Associate Program, Lincoln maintained and plaintiff was covered by an employee's group life insurance program, contributory retirement and pension plan, major medical program, and vacation benefits.

23. Working as a staff associate was not necessary to satisfy the requirements at M.I.T. for a Ph.D. in electrical engineering. Plaintiff as a staff associate performed similar work in research as that required of all candidates for that degree, and he was given credit for all of the research he performed at M.I.T. in partial satisfaction of the requirements for his doctorate. The number of staff associates awarded that degree was about 2 or 3 of the approximate number of 20 successful candidates per year for the same degree in the period around 1960.

24. During the period January 1, 1960, through August 29, 1960, plaintiff had no work responsibility at Lincoln Laboratory and never reported there, nor was he required to, but spent all of his working time on the M.I.T. campus in pursuit of the study, research and writing required by M.I.T. for a Ph.D. degree in electrical engineering. The study, research, and writing performed by plaintiff during that period, or substantially similar work, was required of all candidates for the same degree at M.I.T. at that time, regardless of whether they received payments from Lincoln.

25. Financial support available to graduate students at M.I.T. in the form of a fellowship is defined in the university bulletin as follows:

A fellowship is an award of a cash stipend, with or without a credit against tuition fees, to aid the recipient in his pursuit of advanced study

and research. This award, based on academic performance and promise of professional competence recognizes the recipient as having demonstrated the promise of unusual attainments. The recipient is designated as a Fellow for the period specified in this award. He pays full tuition and has full student status, and no services are required of him in connection with the fellowship.

M.I.T. does not require a fellowship holder to execute a patent or invention agreement where he works in a laboratory not sponsored by the Government.

26. As in the case of most of the staff associates who completed the Staff Associate Program, plaintiff resumed his status as a staff member at Lincoln on August 29, 1960, was paid $1,250 per month thereafter until January 1, 1961, when his pay was raised to $1,360 per month, to $1,550 per month on January 1, 1962, and to $1,670 per month on April 1, 1963. As of the trial of this case in 1966, his salary at Lincoln was in excess of $23,000 per year.

ULTIMATE FINDINGS AND CONCLUSIONS

27. The primary purpose of Lincoln's Staff Associate Program was to enable Lincoln to compete with industry and other organizations in the recruitment, training, and retention of scientific and professional personnel to be employed in the operation of its research laboratory.

28. Plaintiff, as a staff associate under that program, was obviously benefited by the furtherance of his education and training at M.I.T. under the sponsorship of Lincoln.

29. The appointment of plaintiff, as an employee of Lincoln, and other qualified employees of Lincoln, to its Staff Associate Program, was made with the reasonable expectation that such employees after completion of their further education and training at M.I.T. would not resign from their staff association with Lincoln but would resume their full-time staff membership, and thus provide

Lincoln with qualified personnel necessary for conduct of Lincoln's basic function of conducting research under contract with the Government concerning the communications and electronics required in the defense of North America.

■ 30. Lincoln's payments to plaintiff while he was a full-time graduate student at M.I.T. under the Staff Associate Program, from January 1, 1960, through August 31, 1960, were not compensation for past, present or future employment services, but were made to plaintiff to enable him to pursue studies and research primarily for the benefit of Lincoln.

31. This court has jurisdiction of this case pursuant to 28 U.S.C. § 1491 (1958 ed.) because plaintiffs' petition seeks a judgment for refund of Federal income tax, which claim is founded upon (after compliance with jurisdictional requirements of) the Internal Revenue Code of 1954. 26 U.S.C. §§ 61, 117, 6511, 6532, 7422 (1958 ed.).

32. Treasury Regulations § 1.117-4 (c) (2) provides that payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117 (providing for exclusion of amounts received as scholarship or fellowship from individual taxpayer's gross income) of the Internal Revenue Code of 1954, if such payments or allowances were made to the individual taxpayer to enable him to pursue studies or research primarily for the benefit of the grantor. 26 C.F.R. 1.117-4(c) (2) (Rev. 1-1-60).

■ 33. Treasury Regulations § 1.-117-4(c) (2) is valid because it is a reasonable interpretation consistent with the statutory purpose of section 117 of the Internal Revenue Code of 1954. Ussery v. United States, 296 F.2d 582, 583-586 (5th Cir. 1961); Elmer L. Reese, Jr., 45 T.C. 407, 412-416 (1966).

■ 34. Whether payments or allowances to an individual taxpayer were made to enable him to pursue studies and research primarily for the benefit of the grantor is basically a question of fact. Ussery v. United States, supra, 296 F.2d pp. 586-587; Woddail v. Commissioner of Internal Revenue, 321 F.2d 721, 723-724 (10th Cir. 1963). Cf. Commissioner of Internal Revenue v. Ide, 335 F.2d 852, 855 (3d Cir. 1964); Stewart v. United States, 363 F.2d 355, 357 (6th Cir. 1966).

■ 35. Upon consideration of all of the evidence in the light of the above-cited authorities, and based upon the foregoing detailed and ultimate findings of fact, it is concluded as a matter of law that Lincoln's payments and allowances to plaintiff to enable him to pursue studies and research at M.I.T. were not a scholarship or fellowship grant and were not excludable from his gross income to be reported in his Federal income tax return for the taxable year in question.

CONCLUSION OF LAW

Upon the foregoing findings of fact and conclusions of law, which are adopted by the court and made part of the judgment herein, the court concludes as a matter of law that plaintiffs are not entitled to recover, and plaintiffs' petition is dismissed.

