Dr. John J. WERTZBERGER and Jacquelyn Wertzberger, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 17169–1.

United States District Court,
W. D. Missouri, W. D.

July 24, 1970.

Jackie Lee Smith, Overland Park, Kan., E. L. Nagels, Kansas City, Mo., for plaintiffs.

Eugene D. Silverman, Trial Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

### MEMORANDUM OPINION

JOHN W. OLIVER, District Judge.

This is a civil action brought under § 1346(a) (1), Title 28, United States Code, for the refund of federal income taxes paid by the plaintiffs to the defendant for the calendar years 1964, 1965, and 1966 in the amounts of $353, $679, and $627, respectively, plus interest thereon as allowed by law. The parties have waived their right to a jury trial and have stipulated that the only issue for the Court's determination is

"whether amounts paid to the plaintiff, John J. Wertzberger, [1] during the calendar years 1964, 1965, and 1966 as a resident physician qualify as an exclusion from gross income as a fellowship under Section 117 of the Internal Revenue Code of 1954." (Stipulation of the Parties, filed Sepember 30, 1969).

## FINDINGS OF FACT

1. Dr. John J. Wertzberger became a resident physician in the Department of Surgery of the University of Kansas Medical Center (hereinafer referred to as "UKMC") on July 1, 1964.

2. The UKMC is an instrumentality of the State of Kansas performing the following principal functions: (a) patient care; (b) research; and (c) teaching.

3. In addition to its outpatient clinics, the UKMC has a total bed capacity of 550, serviced by 160 staff physicians (who are also members of the faculty expected to devote forty to fifty percent of their time to teaching activities), 164 resident physicians and 24 interns. The Department of Surgery has 45 surgical residents and approximately 30 faculty members.

4. A resident physician in surgery at the UKMC traditionally works 60 to 65 hours, seven days per week, from seven or eight in the morning "until his work is done" and is on call every third or fourth evening, including weekends and holidays.

5. At the UKMC resident physicians are responsible for providing patient care and performing the type of services that practicing physicians perform, including, but not limited to: (a) taking histories; (b) examining patients and making diagnoses; (c) outlining studies; (d) prescribing treatments; (e) performing various mechanical functions (e. g., blood tests, intravenous procedures); (f) providing pre-operative care; (g) assisting in the performance of operations; (h) performing operations (approximately 600 to 1,000 during the period of residency); and (i) providing post-operative care.

6. Services performed by the residents are subject to constant direction, supervision, and control by the UKMC staff members.

7. A UKMC resident physician, as such, is not a candidate for a bachelor's, master's, doctor's, or any other degree awarded by the UKMC or the University of Kansas. Although a resident may receive a certificate of completion at the conclusion of his residency, the Dean and Provost of the UKMC stated that he "cannot honestly say that in the university sense, * * * [a resident physician] is a candidate for a degree" [Wolf I, 48]. The associate dean of the UKMC stated unequivocally that this certificate "has no academic recognition" [Walker, 32].

8. The performance of each resident physician at the UKMC is evaluated from time to time by members of the staff who are responsible for supervising him. These evaluations are not of the A, B, C, D, "letter grade" or "numerical grade" variety generally used in measuring academic achievement but are rather in the form of progress or performance reports which are kept in the resident's personnel file.

9. Resident physicians obviously are both receiving an education and rendering valuable services to the UKMC, resulting in a mutual benefit, to the hospital and to themselves. The UKMC benefits in numerous ways, such as: (a) providing professional medical care and treatment to patients and thereby helping to run the business of the UKMC; and (b) the teaching, instructing, and supervision, formal and informal, of medical students, interns, student nurses, and assistant residents by the resident physicians.

1. Mrs. Wertzberger is a party to this action only because she filed a joint tax return with her husband for the years in question. Hereinafter, Dr. Wertzberger will be referred to as "the taxpayer" or "the plaintiff."

10. Satisfactory completion of a residency at the UKMC or at another approved institution was a prerequisite to the plaintiff's eventual Board certification in orthopedic surgery. At the conclusion of his four-year residency at the UKMC, the plaintiff was so certified by the American Board of Orthopedic Surgery.

11. The UKMC could not adequately maintain the same volume of patient care without the services of resident physicians. The elimination of the residency program would necessitate the employment of additional staff personnel.

12. Upon initial interview at the UKMC a prospective resident physician normally inquires and is apprised of what the pay will be for the time that he will be there. The amount of pay is not based upon financial need or hardship. The number of resident positions is determined by the Dean's budget for the UKMC filed with the State of Kansas.

13. A resident physician is considered an employee of the UKMC (by both the UKMC and the State of Kansas) and is issued payroll warrants (income tax and social security (F.I.C.A.) contributions being withheld) twice per month, like any other employee of the UKMC based on time sheets from funds appropriated by the Legislature of the State of Kansas to defray the cost of salaries and wages of the UKMC.[2]

14. The moneys paid to Dr. Wertzberger during the period of his residency were viewed by UKMC and the State of Kansas as salary payments, subject to the withholding of federal income tax and F.I.C.A. payments. Plaintiff's contention that these moneys were grants in support of a "fellowship" is improperly based upon the amount of money paid to him. See pages 12–14 of plaintiff's deposition of September 30, 1969.

15. The amount paid to a resident normally increases over the years of his residency. Such increases are reflected as "Salary Changes" on a "Change of Employment Status" report and are incorporated into the resident physician's personnel file.

16. The resident physicians, acting through their elected liaison committee, the House Staff Committee, have on occasion negotiated to have the amounts paid to them increased.

17. In addition to their monetary remuneration, all residents are given certain fringe benefits by the UKMC, including: (a) $75 in monthly meal tickets; (b) uniforms; (c) laundering of uniforms; (d) an annual two-week paid vacation; (e) hospitalization coverage and medical care for themselves and their families; (f) professional liability insurance; (g) low interest-bearing loans; (h) allowances to purchase journals and books; (i) free parking.

18. Plaintiff did not apply for any fellowship grant. There are no specific fellowship grants offered or available in the Department of Surgery.

19. Scholarships, fellowship grants, gratuitous stipends, and allowances are treated completely differently by UKMC from salary payments made to residents. They are classified under Object Codes 550, 561 and 562 (See Def. Exh. 1 entitled "Summary of Expenditures by Activity and Object" attached to Mr. Leming's deposition) and are paid from funds specifically so designated by the Legislature. They are not part of the Dean's budget request for resident physicians and are written through a different system in Topeka on miscellaneous warrants issued once a month with no income taxes being withheld.

## CONCLUSIONS OF LAW

While this case was under advisement in this Court, the United States

2. See Def. Exh. 4, "Payroll Distribution and Certification Statement;" 5, "Officers and Employees Payroll;" and 6, "Wertzberger payroll warrants." See also Def. Exh. 2, the "Summary of Expenditures by Activity and Object." An attachment to that exhibit shows salary payments to the resident physician under Object Code 110, entitled "Unclassified Employees" which also includes Faculty and Staff personnel.

Court of Appeals for the Eighth Circuit handed down its decision in Quast v. United States, 428 F.2d 750, (8th Cir., 1970), affirming the judgment rendered in Quast v. United States, 293 F.Supp. 56 (D.Minn., 1968) which denied a § 117 I.R.C. exclusion to a so-called "career resident" at the Veterans Administration Hospital in Minneapolis, Minnesota. Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969), upon which the Court of Appeals in *Quast* relied in part, was decided after appellant's original brief had been filed in that case. Both cases involved individuals who received cash payments (held to be taxable salaries) and fringe benefits during the training portions of their respective programs. The factual situation in *Quast* was extremely close to that presented in this case. The taxpayer there was a "career" resident rather than an "ordinary" resident. The only apparent difference between these types of residencies was that a career resident agreed in addition to performing the ordinary duties of a resident, to be employed at the Veterans Hospital for a two year period after his three year residency, at the hospital's option. *Quast* and this case both involved situations legally comparable to that described by the Supreme Court in Bingler v. Johnson, *supra*, in that "the fruits of [the taxpayer's] work were made directly available to and exploited by the employer" 394 U.S. at 751, 89 S. Ct. at 1445.

In *Quast* the Court of Appeals relied in part on Woddail v. Commissioner of Internal Revenue, 321 F.2d 721 (10th Cir., 1963) and Bonn v. Commissioner of Internal Revenue, 34 T.C. 64 (1960). Those cases involved full-time resident physicians at the Winter Veterans Administration Hospital in Topeka, Kansas. The taxpayers there involved received their residence training in neurology and psychiatry at the Menninger Foundation pursuant to a contract between the Foundation and the Veterans Administration. The factual circumstances in both those cases presented a case for exclusion under § 117 which is arguably stronger than that presented in this case. In both of those cases, the resident physicians, unlike the taxpayer in this case, also participated in a formal training program which was additional to and separate from their duties and services as resident physicians. Nevertheless, it was held that no portion of the amounts received by the taxpayers in those cases was entitled to exclusion from gross income under § 117. The Court of Appeals' explicit approval of *Woddail* and *Bonn* requires a like conclusion in this case.[3]

Bingler v. Johnson, *supra*, examined in detail the Treasury regulations which limit and define the availability of an exclusion from gross income under § 117. In regard to that portion of the regulation which defines "scholarship" and "fellowship grant" (26 C.F.R. § 1.-117–3(a) and (c)) the Court concluded that "the definitions supplied by the Regulation clearly are prima facie proper comporting as they do with the *ordinary understanding* of 'scholarships' and 'fellowships' as relatively disinterested, 'no strings' educational grants with no requirement of any substantial *quid pro quo* from the recipients. 394 U.S. 741 at p. 751, 89 S.Ct. 1439 at p. 1445." (Emphasis ours.)

Under the factual situation presented, we find and conclude that the money plaintiff received was not paid to him under either a fellowship grant or a scholarship as those terms are defined

---

3. For a factual situation which permits a § 117 exclusion for physicians engaged in postgraduate study, see Revenue Ruling 57–560, 1957–2, Cum.Bull. 108. There, physicians studying under the auspices of the Mayo Foundation and Mayo Properties Association received actual fellowship grants and cost-of-living allowances, but "render[ed] no service, replace[d] no personnel who would be employed on a salary basis, and perform[ed] no functions for the benefit of the grantor or training institution * * *."

in the applicable law and as those terms are ordinarily understood. On the contrary, we find and conclude that the money plaintiff received was paid to him as compensation for his services as a resident physician, all of which were subject to the direction and supervision of the UKMC. We therefore find and conclude that the amounts paid to the plaintiff by the UKMC during the years in question do not qualify for exclusion from gross income under § 117 I.R.C.

Accordingly, it is

Ordered, adjudged, and decreed that the Clerk enter judgment for the defendant herein.