**Robert L. SHUFF**
**and**
**Katherine V. Shuff, Plaintiffs,**

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. A. No. 70-C-106-R.**

United States District Court,
W. D. Virginia,
Roanoke Division.

Aug. 27, 1971.

John Penn Lee, Bates, Cruey & Lee, Roanoke, Va., for plaintiff.

Helen E. Marmoll, Atty. Tax Division, Dept. of Justice, Washington, D. C., for the United States.

## OPINION and JUDGMENT

DALTON, District Judge.

This action involves the plaintiffs' claim for a refund of taxes which they assert were erroneously and illegally assessed and collected by the defendant. Jurisdiction is conferred upon this court by 28 U.S.C. § 1346(a) (1).

The facts pertinent to this case are as follows. The plaintiffs, Mr. and Mrs. Robert L. Shuff, filed a joint return for

the calendar year of 1964. In that return the taxpayers included $2,626.67, the amount received in 1964 by Mr. Shuff from Roanoke Memorial Hospital while serving as a resident in hospital administration at that institution, as taxable income. On February 18, 1966, the taxpayers filed an amended return for 1964 and claimed a refund in the amount of $428.74 plus interest. Mr. Shuff claimed that the amount received from Roanoke Memorial Hospital was excludable from gross income as a scholarship under Section 117 of the Internal Revenue Code of 1954.

Relying on the Section 117 exclusion, the taxpayers in their 1965 joint return excluded the amount received in 1965 by Mr. Shuff from the hospital. This 1965 return was filed by the taxpayers sometime prior to April 15, 1966.

As to the refund for the taxable year of 1964, the District Director of the Internal Revenue Service denied such refund on May 13, 1969. As to the 1965 tax return on which the taxpayers excluded the amount received from the hospital, the District Director on June 20, 1969 assessed against the taxpayers a deficiency of $403.90 plus interest of $73.90. On June 30, 1969, the taxpayers filed a refund claim with the District Director for this amount; however, as of July 27, 1970 the District Director had not acted on this claim.

During the period covering July 1, 1964 to June 30, 1965, Mr. Shuff was a tuition-paying student at the School of Hospital Administration at the Medical College of Virginia seeking his Master's degree in hospital administration. The Medical College's program for a degree in hospital administration is a two-year program which requires its students, as a condition to successful completion of degree requirements, to serve as residents in hospitals during the second year. Mr. Shuff, who had completed his first year at the Medical College, had elected Roanoke Memorial Hospital as the hospital at which he desired to serve

his required residency, and that hospital had accepted him as a resident for the twelve month period beginning July 1, 1964.

The Medical College's handbook covering the residency program in hospital administration states that the resident internship is a requirement for all candidates for the Master's degree in hospital administration. Furthermore, the handbook states

"The purpose of the internship is to provide the student an opportunity to: (1) associate intimately with a hospital environment, (2) work closely with the variety of professional persons and disciplines that comprise a comprehensive hospital service, and, (3) meet, under supervision and guidance, the multiplicity of responsibilities and duties that are (*sic*) hospital administration.

Under the program, the hospital at which the student does his internship provides a "preceptor" who supervises and evaluates each student. The details of the internship are determined jointly by the Medical College and the affiliated hospital, which in Mr. Shuff's case was Roanoke Memorial. Basically, the student is rotated through the various departments of the hospital so as to better familiarize him with hospital organization. The Medical College's handbook stresses that "as a student, the resident cannot accept or exercise responsibility for any phase of hospital operation" and that "the assignment of duties and projects by the preceptor constitutes a learning experience for the student and not the exercise of independent judgment or decision for which he has no authority.

As to the financial arrangements made in relation to this program, the Medical College's handbook provides that

[d]uring the internship, the student is not permitted to obtain employment, either full time or part time. For this reason, the affiliated institution agrees to provide a maintenance stipend during the term of residency. It

is anticipated that, as a mature graduate student, the resident will make some service contribution to the institution, thereby justifying the award of this stipend. *This financial aid, however, in no way is to be construed as salary nor is the student an employee of the institution.*

Mr. William Flannagan, Administrator of Roanoke Memorial Hospital and Mr. Shuff's preceptor, testified that originally no stipend was awarded to residents in hospital administration; but that such became necessary to allow students to devote full-time concentration to their studies and relieve them from the necessity of "moonlighting" in order to meet living expenses.

The dispute in the case at bar centers around the question of whether this stipend should be treated as a scholarship and thereby excluded from gross income under section 117 of the Internal Revenue Code of 1954; or, should it be considered as compensation for services rendered and included as taxable income as contended by the defendant.

The pertinent provisions of Section 117 of the Code read as follows:

(a) General rule.—In the case of an individual, gross income does not include—

(1) any amount received—

(A) as a scholarship at an educational institution (as defined in section 151(e) (4)), or

(B) as a fellowship grant, * * *

(b) Limitations.—

(1) Individuals who are candidates for degrees.—In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e) (4), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, re-

search, or other services are required of all candidates (whether recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.

*  *  *  *  *  *

The term "scholarship" has been defined by the Commissioner as

an amount paid or allowed to, or for the benefit of, a student, whether an undergraduate or a graduate, to aid such individual in pursing his studies. The term includes the value of contributed services and accommodations * * * and the amount of tuition, matriculation, and other fees which are furnished or remitted to a student to aid him in pursuing his studies. The term also includes an amount received in the nature of a family allowance as part of the scholarship. Treas.Reg. § 1.117–3(a) (1956).

The term "fellowship" has been similarly defined by the Commissioner. Treas.Reg. § 1.117–3(c) (1956). Furthermore, there can be no doubt that Mr. Shuff was a "candidate for a degree" within the meaning of Section 117 of the Code. See Treas.Reg. § 1.117–3(e) (1956). As stated above, the sole question presented by this case is whether the amounts received by Mr. Shuff from Roanoke Memorial Hospital should be treated as a scholarship or as compensation for services rendered. In this regard, the Commissioner has ruled that an amount paid as compensation for services or primarily for the benefit of the grantor is not considered as a scholarship or fellowship grant. Treas.Reg. § 1.117–4(c) (1956). Basically this regulation states that if an amount is paid to an individual and such amount represents compensation for past, present, or future employment services or represents payment for services that are subject to the direction or supervision of the grantor, then such amount shall not be considered a scholarship and shall be

includable in gross income. Treas.Reg. § 1.117–4(c) (1) (1956). The regulations further provides that any amount paid to an individual to enable him to pursue studies or research primarily for the benefit of the grantor is not excludable under Section 117 of the Code. Treas.Reg. § 1.117–4(c) (2) (1956). This same regulation further states:

> However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. Treas.Reg. § 1.117–4(c) (2) (1956).

The determination of whether the amount received by Mr. Shuff was a scholarship or compensation for services rendered is a question of fact, and as such, many factors must be considered by this court. The first of these factors is the nature of Mr. Shuff's actions while at the hospital. At the trial before this court, Mr. Shuff stated that while at Roanoke Memorial Hospital he was rotated through the various hospital departments. Mr. Shuff also stated that his first assignment was in the administrative personnel department of the hospital where he was oriented with hospital policy and procedure and where he did not perform any duties but merely observed hospital operation.

His second assignment was in the business office where, according to his testimony, he observed and became familiar with the hospital accounting system. In this office Mr. Shuff did perform some routine account posting and payroll processing. His next assignment was with the housekeeping department where he observed the hospital cleaning operation. Mr. Shuff stated that while in this department he actually performed some of the manual labor in order to better acquaint himself with problems peculiar to that operation. Mr. Shuff was then assigned to the personnel department where he observed the hiring, firing, and employee grievance phase of hospital administration. While he sat in on several employee interviews, he performed no substantial duty in this department. Thereafter, Mr. Shuff was rotated to the hospital laundry department where he observed and familiarized himself with that phase of the hospital operation. As in the housekeeping department, Mr. Shuff on some occasions actually performed manual labor in this department, again, to better acquaint himself with the nature of and problems associated with that phase of operation.

Mr. Shuff was next given a special assignment for a two-week period in which he worked with an assistant administrator in studying the problem of visitor regulation. As a result of this study he and the assistant recommended a solution to the hospital administrator. Following this special assignment, Mr. Shuff was assigned to the X-ray and laboratory department for three weeks where he observed the operation of that department and apparently performed no duties. He was next assigned to the dietary department where he worked with the hospital dietician on the hospital's food services operation. According to Mr. Shuff's testimony his period of stay in this department was primarily devoted to observation; however, he did do some work when he thought it would be helpful. Thereafter, Mr. Shuff was assigned to the engineering department where he observed the function of hospital operation pertaining to upkeep of the

physical plant. Mr. Shuff's next assignment was with the purchasing department where he was limited solely to observation since he was without authority to do any purchasing. During the last month of his residency, Mr. Shuff went back through each department reviewing the problem areas which he had spotted during his original rotation. Also during this period, Mr. Shuff worked on his thesis which he was required to submit to the Medical College as a candidate for his degree. During the entire period of residency Mr. Shuff was required to submit monthly progress reports to the Medical College, and was also required to return to the Medical College once a month for on-campus seminars and consultation with Medical College Advisers.

It is next necessary to examine the administrative manner in which the residency position was viewed by the hospital. While it is true that the Medical College's resident handbook for this program stated that the student would receive a maintenance stipend from the affiliated institution, and that the student was in no way considered an employee of the affiliated institution, such a statement by the Medical College cannot be taken as conclusive proof that the amount paid to Mr. Shuff was a scholarship rather than compensation. Examination of hospital policy and procedure is necessary on this question. Mr. William Flannagan, Administrator of Roanoke Memorial Hospital, testified at the trial on this point, and this court deems his testimony as extremely relevant to the determination to be made. Mr. Flannagan explained that his hospital had become affiliated with the Medical College of Virginia on this particular program in an effort to expand Roanoke Memorial Hospital's ever-increasing role as a medical educational institution in the western part of Virginia. In this regard Mr. Flannagan described the various other educational programs conducted or planned at Roanoke Memorial. As to the resident program in hospital administration, Mr. Flannagan testified that such residency was strictly a period of learning and observation, that such residents were not deemed by him as hospital employees, but that residents did perform some tasks as a matter of familiarization with hospital operation.

During the course of his testimony, Mr. Flannagan compared the resident in hospital administration to the medical internship or residency. He first testified that both positions were paid from the hospital's general budgetary funds. He also stated that both received the same monetary amount and the same fringe benefits. At the time of Mr. Shuff's association with Roanoke Memorial Hospital both medical interns and administrative residents were paid from payroll accounts and taxes withheld from payroll accounts and taxes withheld from these payments. Since that time the hospital has changed its accounting procedure as to administrative residents so that payments made to these individuals are accounted for as accounts payable rather than payroll. Mr. Flannagan testified that this change was made in reliance on information from the Internal Revenue Service. He further testified that the reason that the hospital had withheld taxes from the amounts paid to administrative residents at the time when Mr. Shuff was associated with the hospital was that there was no clarification given by the Internal Revenue Service on the matter, and therefore, the hospital had so accounted for the payments as a precautionary measure.

Mr. Flannagan further testified that his hospital treats medical interns as employees because of the many services which they are called on to perform such as emergency room and clinical work. However, Mr. Flannagan said that administrative residents were not considered employees, and the amounts which these individuals receive are considered educational stipends. In support of this distinction Mr. Flannagan stated that while medical interns are "indispensable" to the successful operation of Roanoke Memorial Hospital, administrative residents are "dispensable" and that

they fill no void in the hospital's personnel needs. In further support of the hospital's position that the residents are students rather than employees, Mr. Flannagan pointed out that while medical interns are rotated from each department automatically upon the expiration of regular periods, administrative residents, such as Mr. Shuff, are rotated when the department head feels that the student has successfully familiarized himself with and fully understands the particular phase to which he has been assigned.

In researching this case, this court was unable to discover any judicial decision directly concerning the particular problem herein presented involving a resident in hospital administration. The Commissioner has issued a revenue ruling on the matter holding that amounts paid out of hospital funds to student-employees serving one year at a hospital as administrative residents as a condition to receiving the degree of Master of Hospital Administration from a university constitute compensation for services rendered by the recipient to the hospital. Such amounts are includable in the student's gross income and are also subject to the withholding of income tax. Rev. Rul. 57–385, 1957–2 Cum.Bull. 109. While such rulings are persuasive, they are not conclusive, and this court is not bound by them. Furthermore, this ruling is phrased in terms which indicate that the individual in that situation was treated as an employee and therefore paid a salary. This court is of the opinion that the taxability of such payments is a question of fact, and indeed, the Commissioner in other rulings under Section 117 of the Code has, depending on the facts, ruled differently holding some similar stipends excludable and some includable. For example, the Commissioner has ruled that awards received by students who are candidates for degrees and by other persons enrolled in advanced courses of training for professional nurses at certain universities under the Public Health Service program were excludable where the hospital received reimbursement from the university for the amounts paid to students. Rev.Rul. 57–370, 1957–2 Cum.Bull. 105.

The Commissioner has also ruled that amounts received from the Mayo Foundation and Mayo Properties Association as fellowship grants and cost-of-living allowances by doctors of medicine, who were studying for graduate degrees at a clinic or hospital where they render no service, replace no personnel, who would be employed on a salary basis, and perform no functions for the benefit of the grantor or training institution were excludable. Rev.Rul. 57–560, 1957–2 Cum. Bull. 108. Furthermore, the Commissioner has ruled that stipends paid by a school of medical technology to its student-trainees, who were required to perform no significant services for the school as a condition to receiving such stipend were excludable. Rev. Rul. 64–29, 1964 (Part 1) Cum.Bull. 79.

As to medical interns and residents, the Commissioner has ruled that stipends received by such physicians performing services at a medical training hospital, in order to complete or receive specialized training, constitute compensation for services and are thereby includable in gross income. Rev.Rul. 57–386, 1957–2 Cum.Bull. 107. This ruling on medical interns and residents has judicial support. Quast v. United States, 428 F.2d 750 (8th Cir. 1970); Woddail v. Commissioner of Internal Revenue, 321 F.2d 721 (10th Cir. 1963); Tobin v. United States, 323 F.Supp. 239 (S.D. Tex.1971); Kwass v. United States, 319 F.Supp. 186 (E.D.Mich.1970); Wertzberger v. United States, 315 F.Supp. 34 (W.D.Mo.1970); Coggins v. United States, 26 Am.Fed.Tax R.2d 5775 (N.D. Tex.1970). The rulings of the commissioner under Section 117 of the Code indicate to this court that the factual situation in the case at bar is of great importance in determining the nature of the payments made to Mr. Shuff. There appears to be no one particular fact on which taxability or non-taxability rests; but instead, such determination turns on examination of all the facts.

In deciding the tax status of the payments in the case at bar this court looks to the cases cited above to determine the criteria employed in those decisions in evaluating stipends paid to medical interns and residents. In those cases, which held the payments taxable, the courts found the following factors to be significant: (1) receipt by the hospital of substantial services from the taxpayers, *Wertzberger,* supra, 315 F.Supp. at 35; *Tobin,* supra, 323 F.Supp. at 240; *Kwass,* supra, 319 F.Supp. at 188: (2) the taxpayers were indispensable as hospital personnel, *Wertzberger,* supra, 315 F.Supp. at 36; *Tobin,* supra, 323 F. Supp. at 241: (3) taxpayers received salary increases, *Wertzberger,* supra, 315 F.Supp. at 36; *Tobin,* supra, 323 F. Supp. at 241: (4) taxpayers received same fringe benefits as regular employees, *Wertzberger,* supra, 315 F.Supp. at 36; *Tobin,* supra, 323 F.Supp. at 241: (5) payroll deductions made from these payments, *Wertzberger,* supra, 315 F.Supp. at 36: (6) existence of contract between the resident and the hospital, *Quast,* supra, 428 F.2d at 752: (7) consideration by the hospital that the resident was an employee and that payments were salary, *Wertzberger,* supra, 315 F. Supp. at 36: (8) resident's promise and obligation to remain in the hospital's employ after residency, *Quast,* supra, 428 F.2d at 753: (9) resident was not registered at nor paying any tuition to any university, *Tobin,* supra, 323 F. Supp. at 241.

Consideration of these cases and of the Commissioner's rulings leads this court to the opinion that the payments in the case at bar should be considered as scholarship amounts and not as compensation for services rendered. As scholarships these amounts were excludable from Mr. Shuff's gross income for the taxable years of 1964 and 1965. This court finds nothing in the evidence which shows that Mr. Shuff rendered any substantial services to the hospital nor that his residency was for the primary benefit of the grantor-hospital. See Treas.Reg. § 1.117–4(c) (1956). This court is further of the opinion that the primary purpose of the payments involved was to enable Mr. Shuff to continue his education, and that the payments made by the hospital were not paid in return for services rendered, but merely given by the hospital, as a medical educational institution, as educational stipends. Furthermore, this court feels that the small amount of services which were of incidental benefit to the hospital does not destroy the status of the payments as a scholarship. See Treas.Reg. § 1.117–4(c) (2) (1956).

This court is aware of the *quid pro quo* formula, set forth by the Supreme Court, by which such payments are to be evaluated under Section 117 of the Code. Bingler v. Johnson, 394 U.S. 741, 89 S. Ct. 1439, 22 L.Ed.2d 695 (1969). In *Bingler,* the Court stated:

> Here, the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients. 394 U.S. at 751, 89 S.Ct. at 1445.

This court finds no "substantial *quid pro quo*" required of Mr. Shuff, in the case at bar, as a condition to his receiving the stipend from the hospital. Relying on the particular facts presented in the case at bar, this court orders judgment for the plaintiffs and grants them the relief sought.