ROGER D. FRANCK and JANET N. FRANCK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Franck v. Commissioner
Docket No. 10303-78.
United States Tax Court
T.C. Memo 1980-442; 1980 Tax Ct. Memo LEXIS 144; 41 T.C.M. (CCH) 110; T.C.M. (RIA) 80442; September 30, 1980, Filed James L. Fogle, for the petitioners. Michael J. Cooper, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1975 in the amount of $1,130.65.One of the issues raised by the pleadings has been conceded by petitioner, leaving for our decision only whether the amount of $5,200.94 received by Roger D. Franck from Lutheran Medical Center in 1975 is excludable *145 from petitioners' gross income as a scholarship or fellowship grant under section 117, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in St. Louis, Missouri, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1975 with the Internal Revenue Service Center, Kansas City, Missouri. Roger D. Franck (petitioner) received his bachelor of science degree in mathematics from St. Louis University in May 1973. Shortly after his graduation from St. Louis University, petitioner began working on a full-time basis for St. Elizabeth's Hospital, Granite City, Illinois, as a management services technician trainee. In 1974, petitioner was promoted to the position of administrative assistant. Petitioner enrolled in the Graduate Program in Hospital and Health Care Administration (Program) in 1974 at St. Louis University as a full-time candidate for a degree of master's in hospital *146 administration (M.H.A.).St. Louis University is a private, independent university located in St. Louis, Missouri, which offers both undergraduate academic training and graduate work leading to higher degrees and professional degrees. The Department of Hospital and Health Care Administration (Department) is within the academic jurisdiction of the graduate school of St. Louis University. The Department was established in 1948 and is accredited by the Accrediting Commission on Graduate Education for Hospital Administration and is fully approved for membership in the Association of University Programs in Hospital Administration. Applicants for admission to the program must have a bachelor's degree from a university or college and meet other specified entrance requirements. Students are admitted in September of each year only on a full-time study basis.St. Louis University issues a bulletin with respect to its graduate program in hospital and health care administration. The M.H.A. degree is awarded to students who have attended St. Louis University for at least three academic semesters and successfully completed a minimum of 42 semester hours of prescribed courses, including a residency *147 in hospital administration following the second semester of academic study. Credit for two semester hours of work is given for the residency program. The bulletin, with respect to the program for the period 1976-1978, stated in part with respect to the administrative residency as follows: The residency is eight months long and experience is provided in related health agencies as well as in a hospital approved by the University. An important part of the residency is the preceptor-resident relationship in the actual hospital setting. The program maintains an affiliation with a core group of some fifty health care organizations throughout the United States. Students are placed in these institutions based on a matching process conducted during their second semester of academic work, The residency program is described by St. Louis University in a document entitled "General Format for Administrative Residency." Each student in the program is assigned a faculty advisor, and during the residency is assigned a preceptor who is a member of the administrative staff of the hospital or health-related agency in which the residency is served.
Petitioner's faculty advisor at the university *148 was Associate Professor Richard T. Fox. One of the duties of Professor Fox was to locate good hospitals in which M.H.A. students could serve their residencies and place students in the hospitals and visit and counsel them while they were serving their residencies. The residency program is always served from sometime in May to sometime in December or January. Professor Fox advises his students as to the facility in which they are to be placed for their residency. Petitioner discussed with Professor Fox his interest in serving his residency at Lutheran Medical Center (L.M.C.). L.M.C. is operated by Lutheran Charities Association. Petitioner and Professor Fox agreed that L.M.C. was a desirable place for petitioner to serve his residency. It had some teaching affiliation, such as the nursing school, and it was the kind of hospital that petitioner was interested in working in after receiving his degree. After petitioner agreed with Professor Fox that L.M.C. would be a desirable place to serve his residency, he applied for an administrative residency at that institution. John F. Eckridge, president of L.M.C., was formally appointed petitioner's preceptor. However, as a practical *149 matter, Mr. Hilmar Lohman, vice president of operations of L.M.C., acted as petitioner's preceptor. Petitioner had his interviews seeking acceptance as a resident with Mr. Lohman and was notified by Mr. Lohman that he had been accepted into the program. After two visits to L.M.C., petitioner wrote Mr. Lohman stating that he would like to begin in the program on May 12, 1975, and end on December 21, 1975. By letter dated March 13, 1975, Mr. Lohman informed petitioner that this was agreeable and stated: As previously indicated to you, the pay rate for this residency will be $700.00 a month. At the beginning, we will confirm if this is to be handled as a stipend or on the regular payroll with all the proper deductions. You will be eligible for the medical plan in accordance with our Personnel Policies, per copy enclosed. The same will apply as far as vacation is concerned. On or about May 12, 1975, petitioner began his residency. Petitioner filled out a standard L.M.C. employment application required of all L.M.C. employees, and a standard L.M.C. requisition for personnel was filled out by Mr. Lohman to authorize placing petitioner's name on the payroll. Mr. Lohman maintained *150 a card as a record of petitioner's salary in his office.Petitioner was expected to be at the hospital between the hours of 8 a.m. and 4 p.m. each day. He requested from Mr. Lohman a day off on June 27 and his request was approved with the understanding that the time would be made up on a Saturday or Sunday. Petitioner received a one-week vacation and was covered by the L.M.C. Blue Cross-Blue Shield medical insurance plan and received a discount at the pharmacy during his residency. L.M.C. withheld Federal, Missouri and St. Louis city income tax and F.I.C.A. tax from the amounts paid to petitioner each month. In accordance with the general format for an administrative residency petitioner was assigned no type of administrative duties or other regular work during his residency at the hospital. When petitioner began his residency, he was scheduled, in accordance with the format of the university, for an orientation period. Mr. Lohman drafted a memorandum to the directors of the various services in the hospital explaining to them the time designated for petitioner's orientation in each service area. The orientation period began on May 23 and extended through August 15.While in *151 the orientation program, petitioner spent the morning hours observing the work of the various service areas in the hospital and asking questions of the directors of the services for his own information. In the afternoon, petitioner worked on research projects assigned to him. Further, in accordance with the format for the administrative resident, petitioner was required to submit to St. Louis University by the end of his orientation period, August 15, 1975, a report referred to as "organizational analysis" setting forth the information he had received in his orientation program. After petitioner's orientation program, his entire time was spent in research and preparation of reports which he was required to complete under the format for administrative residency of St. Louis University. The second phase, or Phase II, report concerned the relationship of the hospital to the community. This Phase II report was referred to as "communication analysis" and it was required to be submitted to St. Louis University by November 1, 1975. The third portion of the residency consisted of reports on specific projects. These reports could be based on observations made during the residency *152 experience or on subjects assigned to the students by the preceptor. The format for administrative residency contained the following comments with respect to this phase of the program: The selection of projects is a joint determination between the resident and the Preceptor. The resident is expected to report on at least three projects in which he or she has participated. In the selection of projects, it is expected that variety of subject matter be considered since the project reports become the basis for further discussion in the Policy Seminar course during the student's third semester of academic work. The format went on to describe in a general way what each project report should cover.
Whereas the subject matters of the reports required under Phase I and Phase II were selected and assigned to petitioner by St. Louis University, Mr. Lohman assigned petitioner three projects for Phase III of his residency. The first was a study of the radiology facilities of the hospital, the second a study of transportation facilities, and the third, patient origins. Petitioner submitted the first draft of his report on his study of the radiology department to Mr. Lohman on August 8, 1975, and *153 on or about October 1, 1975, submitted an addendum to the radiology study to Mr. Lohman. Petitioner also submitted this report and addendum to St. Louis University. Petitioner submitted his study of the use of transportation services by L.M.C. to Mr. Lohman and St. Louis University in October 1975. He submitted to Mr. Lohman and St. Louis University his study on the origins of patients of L.M.C. prior to the conclusion of his administrative residency. While petitioner was at L.M.C., he met with Mr. Lohman about once every ten days and met approximately three times with Mr. Eckridge. Mr. Lohman picked the study of the radiology facilities at L.M.C. to assign to petitioner because Mr. Lohman and Mr. Eckridge recognized that there was an efficiency and cost problem in L.M.C.'s radiology department. The radiology department was located in two different areas of the hospital but was under the direction of one individual. For this reason, Mr. Lohman and Mr. Eckridge thought the project would be a good one to further petitioner's education, as well as being a project from which L.M.C. might benefit from any ideas, suggestions or recommendations which petitioner arrived at from his *154 study. Petitioner, in connection with his study of the radiology department, developed various statistics of work done in the department and had discussions with the doctor in charge of the department and other doctors in the radiology department. The original study he submitted contained certain conclusions and suggestions and the addendum to the radiology report contained revised conclusions and suggestions. The transportation study by petitioner included a survey of the transportation policies of other nursing schools, as well as an analysis of the use of transportation facilities by L.M.C. Mr. Lohman assigned the transportation service study to petitioner because he believed this would further petitioner's education and also because L.M.C. was in the process of trying to develop a more efficient and economical transportation service at the time petitioner was an administrative resident. The patient origin study was assigned to petitioner by Mr. Lohman in order to further petitioner's training and also because Mr. Lohman thought it was advantageous to a hospital such as L.M.C. which furnished a great deal of charitable services to understand the origin of its patients. *155 L.M.C., subsequent to 1975, has computerized the origin of its patients. When Mr. Lohman discussed the three research assignments given to petitioner, he only gave the broad parameters of the problems to him and let him work out and develop the projects on his own. At the meetings between Mr. Lohman and petitioner there would be discussion of the projects. L.M.C. participated in the administrative residents program primarily as a contribution to the health care field. Although L.M.C. is not a teaching hospital comparable to a university hospital, it does have educational programs not only in hospital administration but for radiology technicians, laboratory technicians, and social workers as well as a residency program for doctors in family practice. L.M.C. has on occasion had some of its administrative residents return to work for the hospital after they completed their M.H.A. When a candidate for administrative resident is applying, he is usually asked if he is interested in staying in the area or if he plans to leave the area. At the time of the trial of this case, none of the administrative residents that came to the hospital after receiving their degree were with the *156 hospital. Petitioner was assigned no regular work duties at the hospital. Mr. Lohman considered administrative residents to be in a learning capacity, and his contact with them was in helping them with the projects assigned. During the 15 years that L.M.C. has participated in the administrative residency program it has had 8 to 10 administrative residents. It does not have an administrative resident each year. Petitioner received $700 per month from L.M.C. during his residency, or a total of $5,200.94.He did not become employed by L.M.C. after he received his M.H.A. degree. The department at St. Louis University offered three types of financial assistance to graduate students in the M.H.A. program. These were traineeship awards from the United States Public Health Service, scholarships ranging from $1,000 to $1,500 a year, and loans of up to $1,000.Petitioner did not receive a scholarship, traineeship, or loan from the department. Petitioner paid fees as a student to St. Louis University on the basis of taking two semester hours of credit during the entire time he was in the administrative residency program at L.M.C. Petitioners on their Federal income tax return excluded *157 the $5,200.94 received from L.M.C. as an educational stipend. Respondent determined that the $5,200.94 was includable in petitioners' income since it was not excludable under Section 117 because it-- (1) represented compensation for present employment services or payments for services which were subject to the direction or supervision of the grantor, or (2) enabled you to pursue studies and research primarily for the benefit of the grantor. OPINION Section 117(a) provides for the exclusion by a taxpayer from gross income of amounts received as a scholarship or a fellowship grant. For a taxpayer who is a candidate for a degree, section 117(b)(1) provides that the exclusion does not apply to an amount received which represents payment for services in the nature of part-time employment required for receiving the scholarship or fellowship grant.However, this section also provides an exception when the services required of the recipient of the scholarship or fellowship grant are similar to services required of all degree candidates, whether or not recipients of scholarships or fellowship grants, as a condition to receiving such degree. Petitioner in this case was enrolled in *158 a program which required that he serve an an administrative resident for an 8-month period.This administrative residency was required of all candidates for the M.H.A. degree whether or not the candidate received payment while serving his administrative residency. In analyzing the provisions of section 117(b)(1), we have held that the fact that services are required of all degree candidates is not determinative of whether the payment received is excludable from income as a scholarship or fellowship grant. We have held that even though the services performed by the taxpayer receiving the payment are required of all degree candidates, the payment which the taxpayer receives must itself have the characteristic of a scholarship or fellowship grant. Reese v. Commissioner, 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967); Brubakken v. Commissioner, 67 T.C. 249, 254 (1976). Respondent in this case takes the position that the $5,200.94 petitioner received from L.M.C. during his tenure as an administrative resident while he was a student at St. Louis University and a candidate for an M.H.A. degree was not a scholarship or *159 fellowship grant since the payments were compensation for services rendered by petitioner. In the alternative, respondent contends that the amounts were paid to petitioner as an inducement for future services, and, in the further alternative, that the amounts paid to petitioner were primarily for the benefit of L.M.C., the grantor. The record here is clear, and respondent does not even argue to the contrary, that petitioner performed no daily services for L.M.C. and did no work which would normally have been done by a regular employee of the hospital. The services to which respondent refers in arguing that petitioner received the $5,200.94 from L.M.C. as payment for services are the reports that petitioner wrote, copies of which were furnished to L.M.C. as well as to St. Louis University. Section 1.117-4(c), Income Tax Regs., [2] provides that an amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research shall not be considered as a scholarship or fellowship grant if such amount represents compensation for past, present or future employment services, or represents payment for services which are subject to the direction or supervision of *160 the grantor, or amounts paid to an individual to enable him to pursue studies or research primarily for the benefit of the grantor. The record here is clear that the work petitioner did, as distinguished from the hours he worked and the days he took off, was subject to very little supervision by L.M.C. That (1) standard hours of work are expected of an individual, (2) payments received are not based on financial need, and (3) fringe benefits normally granted to employees are granted to an individual are facts indicative of employee status. Brubakken v. Commissioner, supra at 259. However, the presence of these factors does not establish such status where is fact no employee-type duties are performed by the individual. This is also true with respect to the withholding of taxes from the amounts paid to the individual. *161 On the facts here present, we conclude that the payments made to petitioner were not for services rendered. We likewise conclude that the payments were not for future employment services. Although L.M.C. did consider its program as a source of possible employees, there was no form of agreement or understanding that an individual in the program would become employed by L.M.C. nor was there any expectation that the program would lead to future employment. The evidence here does not establish that the payments made to petitioner were to secure his future employment.See Brubakken v. Commissioner, supra at 255. The difficult issue here is whether the payments made to petitioner were to enable petitioner to pursue "studies or research primarily for the benefit of the grantor." [3] Certainly the record here shows that at least two of the projects assigned to petitioner by L.M.C. involved areas in which L.M.C. was experiencing a problem. The record also shows that the information gathered by petitioner and the recommendations he made were of some use to L.M.C. in the handling of the problems to which petitioner's studies were directed. The difficult question is *162 whether these research problems were done "primarily" for the benefit of L.M.C. The regulation states that-- Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental *163 benefit to the grantor, shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. Where a study is of benefit to the grantor only to the same extent that it benefits the public in general, it is reasonably clear that the benefit to the grantor is incidental. However, here the studies done by petitioner did directly concern problems being experienced by L.M.C. Mr. Lohman testified that the projects were considered good educational projects for petitioner, but that he and Mr. Eckridge thought these studies might also be a method of getting some new ideas with respect to problems currently being dealt with by the hospital administration. Considering this record as a whole, we conclude that although the studies petitioner did were of some benefit to L.M.C., that benefit was not the primary reason for the payments to petitioner. The only case which has been called to our attention or which we have found dealing with a factual situation somewhat comparable to that here involved in Shuff v. United States, 331 F.Supp. 807 (W.D.Va. 1971). That case involved a tuition-paying student at the School of Hospital *164 Administration at the Medical College of Virginia who was a candidate for a master's degree. The program for the master's in hospital administration at the Medical College of Virginia was a two-year program which required as a condition to receipt of the degree that the student serve as a resident in a hospital during his second year. The taxpayer in the Shuff case served at Roanoke Memorial Hospital. The purpose stated for requiring the hospital service was basically the same as the purpose stated by St. Louis University, and the student worked under a preceptor just as did petitioner in this case. In the Shuff case the first part of the residency was spent in an orientation program, although the taxpayer in that case did on some occasions actually perform some manual-type labor services for the hospital. However, primarily he studied problems experienced by the hospital and made recommendations as to their solution. The court there determined that the amounts paid were excludable as a scholarship or fellowship grant since there was no substantial "quidproquo" for the payments made to Mr. Shuff. See Bingler v. Johnson, 394 U.S. 741, 751 (1969), *165 in which the Supreme Court, in upholding the Commissioner's regulations under section 117, stated that the ordinary understanding of scholarships and fellowships are relatively disinterested "no-strings" educational grants "with no requirement of any substantial quidproquo from the recipients." The facts in the instant case point even more strongly to no substantial "quidproquo" than did the facts in Shuff v. United States, supra. The taxpayer in the Shuff case did actually render some services to the hospital other than the research project which he performed. The taxpayer in the Shuff case actually recommended a solution to a problem involving visitor regulations to the hospital administrator, as well as making certain other recommendations. It is well settled that whether services are primarily for the benefit of the grantor is a factual question. See Leathers v. United States, 471 F.2d 856 (8th Cir. 1972), in which the court on this basis upheld a jury decision that amounts received by M.D. residents at the University of Arkansas Medical Center were scholarships or fellowship grants rather than compensation. *166 In Reese v. Commissioner, 45 T.C. 407 (1966), affd. per curiam 373 F.2d 742 (4th Cir. 1967), we pointed out (at 411) that a candidate for a M.A.T. degree was not entitled to exclude from her income as a scholarship or fellowship grant amounts received as a substitute teacher in Baltimore County even though she was required to do such teaching to obtain her degree. In so doing, we stated that while Johns Hopkins University and the taxpayer might have considered the taxpayer's teaching primarily to further her education, the Board of Education of Baltimore County was primarily interested "in obtaining a teacher--albeit a substitute teacher--to take full responsibility for a classroom." Were we to conclude on the facts here that L.M.C. was primarily interested in obtaining the information contained in the reports prepared by petitioner, rather than in furthering petitioner's education, we would, under our holding in the Reese case and many other cases, sustain the Government's position. However, on the basis of this record we conclude that the information which L.M.C. might obtain from petitioner's reports was of only incidental interest to L.M. *167 C. The real interest of L.M.C. in having an administrative residency program was to advance the education of students interested in hospital administration work. We therefore hold that petitioner is entitled to exclude the $5,200.94 he received from L.M.C. in the year here in issue from his income under the provisions of section 117. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise stated.↩
2. Sec. 1.117-4(c), Income Tax Regs., provides: SEC. 1.117-4 Items not considered as scholarships or fellowship grants. (c) Amounts paid as compensation for services or primarily for the benefit of the grantor.(1) Except as provided in paragraph (a) of sec. 1.117-2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor. (2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117↩ if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant.
3. Respondent in his argument in this respect relies partially on his Rev. Rul. 73-255, 1973-1 C.B. 55, which involves a factual situation concerning payment to a candidate for the degree of master of hospital administration somewhat comparable to the facts in the instant case. In that ruling, it was concluded that-- Although there was no guarantee that the work purduct of the taxpayer would be of value to the hospital, the hospital had the right to that work product in case it was. Thus, the hospital extracted a quidproquo from the taxpayer and the primary purpose of the grant was for the benefit of the hospital-grantor. There are minor factual distinctions in the revenue ruling and the situation in the instant case. However, as we have said on numerous occasions, a revenue ruling is merely a statement of position by respondent, not binding on this Court.↩