**Dr. Hollis K. (III) and Patricia D. LEATHERS, Appellees,**

v.

**UNITED STATES of America Appellant.**

**Dr. William F. and June B. BLANK-ENSHIP, Appellees,**

v.

**UNITED STATES of America, Appellant.**

**Nos. 71–1647, 71–1648.**

United States Court of Appeals, Eighth Circuit.

Submitted May 12, 1972.

Decided Dec. 20, 1972.

Carolyn R. Just, Atty., U. S. Dept. of Justice, Washington, D. C., for appellant.

Byron M. Eiseman, Little Rock, Ark., for appellees.

Before VOGEL, LAY and BRIGHT, Circuit Judges.

VOGEL, Circuit Judge.

These suits were initiated by Drs. Blankenship and Leathers, plaintiff-appellees herein,[1] for refunds of federal income taxes. The cases were consolidated prior to trial, involving as they did similar issues and facts. A jury trial was had, resulting in verdicts for plaintiffs-appellees. The government then filed motions for judgment notwithstanding the verdicts, or in the alternative for new trials. The District Court denied the motions and a memorandum opinion was filed.[2] We affirm.

Taxpayers were both licensed physicians who were, during the years 1968 and 1969, in the residency program at the University of Arkansas Medical Center (UAMC). Neither doctor was a candidate for a degree. Upon completion of their residency they would have been "board certified" so as to be able to take the qualifying examinations in their specialties. During 1969, Dr. Leathers was a resident in pathology and received $7,237.83 from the UAMC as a "stipend". In 1968, Dr. Blankenship was a resident in orthopedics and received $3,637.47 as "stipend" from the UAMC. In addition, he received $1,260.65 from the Veterans Administration. Of the amounts received, each taxpayer excluded $3,600 from his gross income,[3] contending that such amounts were scholarship or fellowship grants as that term is defined in Section 117 of the Internal Revenue Code of 1954.[4] Deficiencies re-

---

1. Patricia D. Leathers and June B. Blankenship are parties to these appeals due to the fact that they filed joint returns with their husbands for the tax years in issue. For brevity, reference will be made to the husbands only.

2. 352 F.Supp. 1244.

3. Since taxpayers were not degree candidates, the exclusion was limited to $3,600. See note 4 infra, esp. § 117(b)(2)(B).

4. 26 U.S.C.A. § 117 provides in pertinent part:
   "§ 117. Scholarships and fellowship grants
   (a) General rule.—In the case of an individual, gross income does not include—
   (1) any amount received—
   (A) as a scholarship at an educational institution (as defined in section 151(e)(4)), or
   (B) as a fellowship grant,
   including the value of contributed services and accommodations; and
   (2) any amount received to cover expenses for—
   (A) travel,
   (B) research,
   (C) clerical help, or
   (D) equipment,

which are incident to such a scholarship or to a fellowship grant, but only to the extent that the amount is so expended by the recipient.
   (b) Limitations.—
   (1) Individuals who are candidates for degrees.—In the case of an individual who is a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall not apply to that portion of any amount received which represents payment for teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or the fellowship grant. If teaching, research, or other services are required of all candidates (whether or not recipients of scholarships or fellowship grants) for a particular degree as a condition to receiving such degree, such teaching, research, or other services shall not be regarded as part-time employment within the meaning of this paragraph.
   (2) Individuals who are not candidates for degrees.—In the case of an individual who is not a candidate for a degree at an educational institution (as defined in section 151(e)(4)), subsection (a) shall apply only if the condition in subparagraph (A) is satisfied

sulting from this exclusion were assessed and paid, and timely-filed claims for refund were disallowed. Thereafter, the instant suits were filed in the District Court.

On appeal the government raises the following points:

(1) The District Court erred in refusing to grant the government's motions either for directed verdicts or for judgments notwithstanding the verdicts.

(2) The District Court erred in the giving of certain instructions.

(3) The District Court erred in submitting to the jury certain interrogatories.

(4) The District Court erred in excluding certain evidence.

■ We consider first appellant's contention that it was entitled to judgment in both cases as a matter of law. First, the question whether a payment may be excluded from income under 26 U.S.C.A. § 117 is a question of fact to be resolved by the finder of fact.

"Whether payments or allowances to an individual taxpayer were made to enable him to pursue studies and research primarily for the benefit of the grantor is basically a question of fact. Ussery v. United States, * * * 296 F.2d [582] pp. 586–587 [5th Cir., 1961]; Woddail v. Commissioner of Internal Revenue, 321 F.2d 721, 723–724 (10th Cir. 1963). Cf. Commissioner of Internal Revenue v. Ide, 335 F.2d 852, 855 (3d Cir. 1964); Stewart v. United States, 363 F.2d 355, 357 (6th Cir. 1966)." Reiffen v. United States, 180 Ct.Cl. 296, 1967, 376 F.2d 883, 890.

In a case relied upon by the government, Quast v. United States, D.C.Minn., 1968, 293 F.Supp. 56, aff'd, 8 Cir., 1970, 428 F.2d 750, Judge Neville expressly considered this matter:

"Under the Regulations if the *primary* purpose was to further the education and training of the recipient, then the payment would have the characteristics of a fellowship. *This was squarely a fact question and properly submitted to the jury.*" 293 F.Supp. at 62. (Emphasis supplied.)

■ The standards for review are well settled and not in dispute here. This as an appellate court will not reverse a jury's determination of a fact question where such determination is supported by substantial evidence, nor will we substitute our judgment for that of the finder of the facts, whether it be judge or jury. As the late Judge John Sanborn said in another tax case, "It is only when the evidence is all one way or so overwhelmingly one way as to leave no doubt as to what the fact is, that the issue becomes one of law. Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720; Tyson v. Commissioner, 8 Cir., 146 F.2d 50, 54. Cf. Lacy v. United States, 7 Cir., 207 F.2d 352, 354." Weiss v. Commissioner, 8 Cir., 1955, 221 F.2d 152, 155–156. See, Woddail v. Commissioner, 10 Cir., 1963, 321 F.2d 721, 724 (dealing with 26 U.S.C.A. § 117). See, also, G. W. Van Keppel Co. v. Commissioner, 8 Cir., 1961, 296 F.2d 767, 771; Rubber Research, Inc. v. Commissioner, 8 Cir., 1970, 422 F.2d 1402,

---

and then only within the limitations provided in subparagraph (B).

(A) Conditions for exclusion.—The grantor of the scholarship or fellowship grant is—

(i) an organization described in section 501(c)(3) which is exempt from tax under section 501(a),

* * * * *

(B) Extent of exclusion.—The amount of the scholarship or fellowship grant excluded under subsection (a)(1) in any taxable year shall be limited to an amount equal to $300 times the number of months for which the recipient received amounts under the scholarship or fellowship grant during such taxable year, except that no exclusion shall be allowed under subsection (a) after the recipient has been entitled to exclude under this section for a period of 36 months (whether or not consecutive) amounts received as a scholarship or fellowship grant while not a candidate for a degree at an educational institution (as defined in section 151(e)(4))."

1405; Idol v. Commissioner, 8 Cir., 1963, 319 F.2d 647. See generally, Commercial Union Assurance Co. v. Berry, 8 Cir., 1966, 359 F.2d 510, 516.

In the instant case, we must analyze the factors present as against the statute (26 U.S.C.A. § 117), the regulations issued pursuant to the statute [5] and existing case law.

The constitutional validity of the Regulation § 1.117–4(c) was upheld by the Supreme Court in Bingler v. Johnson, 1969, 394 U.S. 741, 89 S.Ct. 1439, 22 L. Ed.2d 695, a case much relied upon by the appellant. There the taxpayers were employees of the Westinghouse Electric Corporation. They desired to take advantage of a company-sponsored educational leave program. During the time they were on the educational leave program, they received compensation from Westinghouse based in part on a percentage of their base salary. They retained seniority status and all employee benefits such as insurance and stock option privileges. They were obligated, among other things, to return to Westinghouse for a period of at least two years after completing the program. A jury in the District Court found that the amounts paid the taxpayers were taxable "compensation" rather than excludable "scholarships". The Court of Appeals for the Third Circuit, in Johnson v. Bingler, 396 F.2d 258, 263, reversed, holding that the issue should not have been submitted to the jury, there being involved " * * * a question solely of statutory construction, requiring only judicial exegesis." 396 F.2d at 263. The Supreme Court, in reversing the Court of Appeals, said, at page 755 of 394 U.S., at page 1447 of 89 S.Ct., at page 707 of 22 L.Ed.2d:

"Under that provision, [Treasury Regulation § 1.117–4(c)] as set out in

---

5. In particular, we are concerned with 26 CFR §§ 1.117–3(c) and 1.117–4, which provide in pertinent part:

"§ 1.117–3 Definitions.

\* \* \* \* \*

"(c) *Fellowship grant.* A fellowship grant generally means an amount paid or allowed to, or for the benefit of, an individual to aid him in the pursuit of study or research. The term includes the value of contributed services and accommodations (see paragraph (d) of this section) and the amount of tuition, matriculation, and other fees which are furnished or remitted to an individual to aid him in the pursuit of study or research. The term also includes any amount received in the nature of a family allowance as a part of a fellowship grant. However, the term does not include any amount provided by an individual to aid a relative, friend, or other individual in the pursuit of study or research where the grantor is motivated by family or philanthropic considerations."

"§ 1.117–4 Items not considered as scholarships or fellowship grants.

"The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\* \* \* \* \*

"(c) Amounts paid as compensation for services or primarily for the benefit of the grantor. (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, if such amount represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor.

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant."

the trial court's instructions, *the jury here properly found that the amounts received by the respondents were taxable 'compensation' rather than excludable 'scholarships.'* The employer-employee relationship involved is immediately suggestive, of course, as is the close relation between the respondents' prior salaries and the amount of their 'stipends.' In addition, employee benefits were continued. Topics were required to relate at least generally to the work of the Bettis Laboratory. Periodic work reports were to be submitted. *And, most importantly, Westinghouse unquestionably extracted a quid pro quo.* The respondents not only were required to hold positions with Westinghouse throughout the 'work-study' phase of the program, but also were obligated to return to Westinghouse's employ for a substantial period of time after completion of their leave. *The thrust of the provision dealing with compensation is that bargained-for payments, given only as a 'quo' in return for the quid of services rendered—whether past, present, or future—should not be excludable from income as 'scholarship' funds.* That provision clearly covers this case." (Emphasis supplied.)

As will appear more in detail later, the facts in *Bingler* are clearly distinguishable from the facts in the instant case. Additionally, in reversing the Court of Appeals, the Supreme Court was sustaining the right of the jury to make the determination of whether the payments were "compensation" and therefore taxable or were "scholarships" and accordingly deductible. The Supreme Court held that under the facts in *Bingler* " * * * the jury here properly found that the amounts * * * were taxable 'compensation'."

To recapitulate, the facts which existed in *Bingler* and which, according to the Supreme Court, justified the jury in "properly" finding that the amounts received were compensation instead of scholarships, are non-existent herein: There was prior employer-employee relationship. There was close relationship between respondents' prior salaries and the amount of their "stipends". There was continuation of employee benefits. Topics of study were required to relate at least generally to the work of the Bettis Laboratory. Periodic work reports were required. Taxpayers were required to hold positions with Westinghouse throughout the work-study phase of the program. Taxpayers were obligated to return to the employ of Westinghouse. All of the foregoing factors were present in *Bingler* and thereby, as the Supreme Court put it, " * * * most importantly, Westinghouse unquestionably extracted a quid pro quo." The jury found that lacking in the instant case, and we believe they were entitled to so find.

The problem of whether or not stipend payments received by a resident constitute taxable income has been considered in numerous other cases. Various factors have been utilized by the fact-finders, both judge and jury, to aid in determining whether or not such payments are excludable fellowships or includable compensation. Some cases have hinged upon the existence or absence of a requirement to stay with the employer after completion of the residency training.[6] Others have carefully scrutinized the degree of supervision over res-

6. Compare Bingler v. Johnson, supra, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695; Woddail v. C. I. R., 10 Cir., 1963, 321 F.2d 721; Quast v. United States, D.C. Minn.1968, 293 F.Supp. 56, aff'd, 8 Cir., 1970, 428 F.2d 750; Steinhaus v. Commissioner, 1971, P–H Memo T.C., par. 71,279 (requirement of employment after completion of residency program evidence of payment of compensation for future services) with Wrobleski v. Bingler, 1958, W.D.Penn., 161 F.Supp. 901; Lingl v. Charles, 1967, S.D.Ohio, 21 AFTR2d 410; Wells v. Commissioner, 1963, 40 T.C. 40. Cf. Coggins v. United States, 1970, N.D.Tex., 26 AFTR2d 70–5775; Birnbaum v. Commissioner, P–H Memo T.C., par. 71–231; Fisher v. Commissioner, 1971, 56 T.C. 1201 (no requirement of future services after completion of residency evidence of fellowship).

idents and the extent of services performed by residents,[7] whether the hospital in question was primarily engaged in teaching or patient care,[8] whether the hospital could perform the same services without the residents.[9] Finally, such diverse factors as the classification of an employee as a physician,[10] whether taxes have been deducted from his stipend,[11] whether the residents have received the normal incidental benefits of an employee such as free laundry service, free parking, free health and malpractice insurance, sick leave and paid vacations,[12] or whether yearly increases in pay are contemplated.[13]

The UAMC, at which both plaintiff-appellees received their residency training, is strictly a teaching institution with its primary purpose being the education and training of physicians, nurses, pharmacists and other individuals involved in taking care of the ill. The UAMC has a full-time faculty membership of approximately 180, with many more practicing physicians donating their time to the medical school teaching program without compensation and on a part-time basis. Neither the UAMC nor the State of Arkansas requires any resident to remain in that state after the completion of residency training. The residents are closely supervised by faculty members in the hospital, and UAMC does not bill patients for the services provided by the residents.

During the course of their training at the UAMC, many residents are rotated to one of the Veterans Administration Hospitals in Little Rock for three months of the year. In the instant case, Dr. Blankenship worked at the VA Hospitals three months during the year in question. Although Dr. Blankenship performed some patient care services while at the VA Hospital, we agree with the District Court that the residency program as a whole rather than one segment of it must be looked to in order to determine the issue before us.

Dr. Winston Shorey, Dean of the School of Medicine at the UAMC, was asked whether the work of the Medical Center could be performed without residents. He replied:

"A There would have to be some rearrangement, but the faculty, I believe, could perform the professional responsibilities, take care of the patients without the residents.

"I would make possibly one exception, the very heavy load in obstetrics requires a lot of hands, and the staff, the faculty in that department right now, is small and I would want to make that one exception. I think the hands of the residents, but not only the residents, but the medical students participating on this service, would be necessary, too.

"Q Dr. Shorey, neither Dr. Blankenship nor Dr. Leathers was involved in obstetrics in any way?

"A. No. * * *"

Dean Shorey's testimony was generally corroborated by Dr. Jaques, Chairman of the Department of Pathology, and Dr. Chambers, head of the Orthopedic Sur-

7. *Coggins*, supra; *Fisher*, supra; *Birnbaum*, supra; *Steinhaus*, supra; *Wrobleski*, supra (close supervision indicates no benefit to hospital); Tobin v. United States, 1971, S.D.Tex., 323 F.Supp. 239; Dimants v. Commissioner, 1970, P–H Memo T.C., par. 70,257; Proskey v. Commissioner, 1969, 51 T.C. 918.

8. Compare *Woddail*, supra; *Dimants*, supra; with *Wrobleski*, supra. Cf. *Birnbaum*, supra; *Coggins*, supra.

9. See, *Wrobleski*, supra; *Wells*, supra. But cf. *Steinhaus*, supra.

10. See *Woddail*, supra.

11. Wertzberger v. United States, 1970, W.D.Mo.W.D., 315 F.Supp. 34, aff'd, 8 Cir., 1971, 441 F.2d 1166; *Woddail*, supra; *Dimants*, supra; *Proskey*, supra; *Coggins*, supra; *Quast*, supra.

12. *Woddail*, supra; *Tobin*, supra; *Quast*, supra; *Wertzberger*, supra; *Birnbaum*, supra; *Steinhaus*, supra; *Proskey*, supra; *Coggins*, supra; *Wells*, supra; *Lingl*, supra; *Fisher*, supra.

13. *Wertzberger*, supra; *Birnbaum*, supra; *Proskey*, supra; *Coggins*, supra; *Fisher*, supra.

gery Division, as well as by James A. Crank, Director of the University Hospital. Somewhat conflicting testimony was elicited from Kenneth J. O'Brien, Director of the Veterans Administration Hospitals in Little Rock. Mr. O'Brien testified:

"Q  Is there a learning situation presented for the resident at the Veterans Hospital?

"A  We feel that there is.

\*    \*    \*    \*    \*    \*

"A  We feel that the resident, when he's with the VA, performs a dual function. He is there primarily as—I'll have to clarify that word— 'partially' as a student; but we can't discount the fact that we feel there is some service provided, and the basis is that if we could relate it to the orthopedic service, as Dr. Chambers indicated, we have three one-quarter-time orthopedic men on the staff. This is less than one full-time man.

"We have a forty bed ward. We have better than a hundred out-patient visits a week; and if suddenly, Monday morning all the orthopedic residents left, that three-quarters of one person couldn't handle the job.

"From an economic standpoint, we would have to hire some staff people to make up for that loss of residents. From this standpoint, they perform a service, we believe.

"Q  So if these residents were not present, there would have to be additional staff to care for the patients?

"A  We feel there would have to be some additional staff, although we feel there is certainly a training environment that can't be separated from service. They both go on at the same time.

"Q  Would you say it's about half and half then?

"A  Basically, that's the way the residency program in VA started. We were charged a half an employee per resident.

"I think different residency programs have different proportions of how much is service and how much is training. There is a service aspect of each one because we are a service hospital. We are a teaching hospital, but primarily give services, too.

"Q  Primarily—I'm sorry?

"A  We are required by Congress to furnish service to veterans, primarily, not to be a teaching hospital primarily."

It should be noted that Dr. Blankenship was the only one of the taxpayers who worked at the VA Hospital and that he spent approximately three months during the year there.

All of the witnesses testified that the work of the residents was closely scrutinized and carefully checked and very little, if any, discretion was permitted regarding patient diagnosis and care.

Residents were permitted a two-week paid vacation if possible. Uniforms and laundry service were provided free of charge. Pay increases were unrelated to financial need. Various taxes were deducted from the residents' stipend checks.[14] Malpractice insurance was provided to the residents by the hospital. Residents belonged to a separate health insurance plan and were not eligible for the hospital's retirement plan. A resident was required to sign an employee termination clearance form upon the completion of his residency and the hospital by-laws stated that interns and residents shall provide medical care.

■  Enough has been noted to indicate that conflicting evidence presented genuine questions of fact for the jury to resolve. Judge Eisele was eminently

14.  The District Court did not permit the government to introduce evidence of payroll deductions. In light of the cases cited in note 11, supra, such evidence could have been admitted, but we cannot say that its exclusion was prejudicial error.

correct in submitting the cases to the jury for its determination and in denying motions for judgments notwithstanding after the verdicts had been rendered by the jury in behalf of the plaintiff taxpayers. This, as an appellate court, may not substitute its judgment for determinations by the triers of the facts where such determinations are based upon conflicting and substantial evidence.[15]

The argument is suggested that this is a tax loophole and the use of tax loopholes should not be encouraged. We do not agree to the classification, but assuming arguendo that this is a tax loophole, then it is a Congressionally created one, done so by the Congress and the Executive with the specific intent of allowing deductions from income tax in accordance with the provisions of § 117. If these taxpayers come within the embracing terms of the section and meet the provisions of the regulation which received the approval of the Supreme Court in *Bingler*, then any reversal of the jury's determination which was made on substantial facts would be nothing more nor less than judicial legislation or legislation by judicial veto. If § 117 establishes a loophole and is unfair to other taxpayers, then the remedy lies with Congress and not with this or any other court.

In its appeal, the government raises several additional points, each of which we find to be without merit and requiring but brief comment. Complaint is made with reference to certain instructions which the government claims were more favorable to the taxpayers' view than that of the government, as well as the wording of the interrogatories. We have carefully read the instructions and have examined the interrogatories submitted to the jury. We find no error therein. A trial court is not required to use the exact language of a requested instruction or the exact language of a requested interrogatory in order to avoid error. Instructions and interrogatories in the court's own language, as long as they are accurate and fair to both parties, may not be used as a basis for error. We find the instructions and the interrogatories here completely accurate, unbiased and without prejudice.

The government also complains that various evidence it sought to introduce was erroneously excluded and that certain exhibits in evidence were kept from the jury room. While some of the evidence could have been admitted, its exclusion we find to be not prejudicial. Note, supra, comment regarding evidence of payroll deductions. The refusal of the trial court to send all of the exhibits, many of which were irrelevant, to the jury room was a discretionary matter and we find no abuse of that discretion.

We are in accord with Judge Eisele's well-considered opinion in which he denied motions for judgments notwithstanding the verdicts. This case is in all things affirmed.

LAY, Circuit Judge (concurring):

Under the testimony presented here, a jury or other fact-finder could well find that the payments were made, in the words of the district court, "to allow [the residents] to pursue studies and advance their training."[1]

---

15. We think it significant to note that in all of the reported cases dealing with this particular problem, with the single exception of the very recent case of Hembree v. United States, 464 F.2d 1262, 4 Cir., 1972, dec. August 3, 1972, and which is distinguishable on its facts, the determination of the fact-finder (whether judge or jury) has never been overturned. See, Wertzberger v. United States, supra, 441 F.2d 1166 (judge as fact-finder); Quast v. United States, supra, 293 F.

Supp. 56, aff'd, 8 Cir., 1970, 428 F.2d 750 (on motion for judgment n. o. v.); Kwass v. United States, 1970, E.D.Mich.S.D., 319 F.Supp. 186. The same is true of *Bingler*, supra, where the Supreme Court reversed the Court of Appeals and affirmed the jury's determination.

1. A significant distinction can be made between this case and the Fourth Circuit's case of Hembree v. United States, 464 F. 2d 1262, 1264 (1972). There the dis-

Whether one uses the "compensation" test or the "primary benefit" test should make no difference. As the Supreme Court stated in Bingler v. Johnson, 394 U.S. 741, 758 n. 32, 89 S.Ct. 1439, 1449, 22 L.Ed.2d 695 (1969) citing the government's brief: "'[T]he general idea is the same: "scholarship" or "fellowship" does not include arrangements where the recipient receives money and *in return* provides a *quid pro quo.*'" (My emphasis.) The fundamental issue is whether the "stipend" received by the residents is "in return" for the services or whether the services are merely incidentally furnished to the grantor and the money is paid to allow the students to pursue their studies and advance their training and research. Although the facts in this case are disputed on this issue, there is substantial evidence to support the jury's finding in favor of the taxpayer.[2] Since this is a jury verdict we cannot set aside the result even if we feel it is "clearly erroneous."[3]

The dissenting opinion expresses concern over disparity of tax treatment between taxpayers similarly situated. Such apprehension has been sounded before (See Commissioner v. Duberstein, 363 U.S. 278, 290, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); cf. Bingler v. Johnson, 394 U.S. at 753, 89 S.Ct. 1439, 22 L.Ed.2d 695), but apprehension alone cannot somehow serve to transform a basic question of fact into one of law. See generally Commissioner v. Duberstein, supra; Commissioner v. Heininger, 320 U.S. 467, 475, 64 S.Ct. 249, 88 L.Ed. 171 (1943).

BRIGHT, Circuit Judge (dissenting).

In this case we are again called upon to answer the question of whether amounts paid through residency programs to physicians obtaining advanced

---

trict court utilized the wrong standard by considering the primary purpose of the institution rather than the primary purpose of the payment.

2. The evidence adduced demonstrates that the declared purpose of the University of Arkansas Medical Center (UAMC) is to provide educational programs to train physicians, nurses, pharmacists and specialists. The "Stipend Appointments" received by Dr. Blankenship and Dr. Leathers did not expressly require the rendition of any services. These stipends were made for the support of the doctors and their families, *and any yearly increments were based upon increased family responsibilities, not increased or improved services rendered.* The UAMC officials testified that the payments were not considered to be compensation for services, and the patients cared for by the medical staff could have been adequately cared for by the faculty without the help of the interns and residents, except possibly in the obstetrics division. (This is not in my opinion a critical factor for as Judge Bright points out the services were in fact performed by the residents allowing the faculty to devote their time to other endeavors.) Both doctors were under the supervision and close scrutiny of a faculty member, and their decisions and reports were subject to prior approval. Dr. Leathers testified that approximately two-thirds of his time was spent in personal study. UAMC did not charge for any patient care performed by the residents. Although Dr. Leathers and Dr. Blankenship participated, to a small extent, in the teaching program, neither were contractually obligated to do so. The doctors were not required to continue their residency or remain with the hospital or within the state upon completion of their training. It is obvious that the jury inferred from this evidence that the monies paid were not in return for the services rendered. Such is a fair inference.

3. A jury verdict is subject to a more restricted review on appeal than a single judge's finding of fact. A trial judge's finding of fact may be set aside if it is "clearly erroneous." Fed.R.Civ.P. 52(a). Cf. Commissioner v. Duberstein, 363 U.S. 278, 290–291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). This means that although there exists substantial evidence to support the finding, if the court of appeals possesses a firm conviction that a mistake has been committed, it may still reverse. See e. g., Oil Screw Noah's Ark v. Bentley & Felton Corp., 322 F.2d 3, 5–6 (5 Cir. 1963); cf. United States v. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). On the other hand, a jury verdict may not be set aside where substantial evidence exists notwithstanding the court of appeals disagreement with it.

medical training are excludable from gross income and therefore nontaxable. We answered this question negatively in Wertzberger v. United States, 441 F.2d 1166 (8th Cir. 1971), and in Quast v. United States, 428 F.2d 750 (8th Cir. 1970). I would reach a similar result here, adverse to the taxpayers, notwithstanding that, unlike the earlier cases, the district court decision favored taxpayers.

I briefly recapitulate the underlying facts upon which there is no real dispute, aside from differing inferences which the parties seek to draw from them.

### Dr. Leathers—Pathology Resident

Dr. Leathers received his license to practice medicine in Oklahoma. Prior to beginning his residency at UAMC, he served as a flight surgeon in the Navy. During 1969, the tax year in question, Dr. Leathers served as pathology resident at UAMC, spending the majority of his time in the second-year program. His duties under supervision of the staff doctors, included examining 1800 surgical specimens, determining that they were labeled properly and that slides were made, and dictating his opinion of the disease process indicated. He engaged in 58 frozen section studies, performed 28 autopsies, participated in weekly teaching conferences with staff members, assisted in the teaching of residents and medical students, and, on eight occasions, served as a pathological resident on emergency call. He lectured to medical school students and devoted the majority of his time, according to his testimony, to personal study.

Dr. Leathers received a stipend of $7,237.83 from UAMC through its residency program. In addition, he performed autopsies at $50 each for the Veterans Administration Hospital—these payments, however, are not in controversy here.

### Dr. Blankenship—Orthopedic Surgery Resident

Dr. Blankenship, following graduation from medical school, served two years in the Army as a medical officer prior to entering the residency program in orthopedic surgery at UAMC in 1967. During the first six months of 1968, the tax year here in question, he completed service as a first-year resident and thereafter worked in the second-year residency program for the balance of the year.

During this one-year period, he performed or assisted in general surgery for the first six months, three of which were spent at the Little Rock Veterans Administration Hospital. He personally performed 20 operations, such as hernia repair, hemorrhoid operations, and surgical correction of stomach ulcers, and assisted in approximately 40 others. He also administered anesthetics in the operating room, taught senior medical students, and engaged in independent study.

His work as a second-year resident was similar except that it related solely to orthopedic medicine and surgery. Staff doctors supervised his work. Dr. Blankenship received a stipend of approximately $5,000 in 1968.

### Residency Program

The residency programs at UAMC do not lead to a degree but provide necessary training for certification in a specialty. UAMC also supervises the training afforded residents at the affiliated Veterans Administration Hospital in Little Rock. The UAMC brochure explaining the post-graduate program notes that "Hospital and clinic patients, numbering about 100,000 annually, come under scrutiny of the staff, and interns and residents play the predominant role in their care."

At the time of trial, the stipend for residents began at $6,800 per annum and increased $300 each succeeding year. Amounts were not geared to need. Residents were furnished uniforms and medical malpractice insurance. Similar stipends and benefits were provided during the tax years in question. According to the testimony of the Dean of the School of Medicine, the mission of UAMC is to "provide educational programs to edu-

cate and train physicians, nurses, pharmacists, and other individuals involved in taking care of the ill." The University Hospital of UAMC is described as a "teaching hospital," and UAMC's full-time faculty of 180 persons is supplemented by the services of Arkansas practicing physicians. Residents are not required to remain in the state after residency training. The hospital does not specifically bill patients for the services of residents.

The plaintiffs introduced testimony indicating that, with rearrangement of time, the faculty could provide professional care for patients without the aid of residents, except in obstetrics—not here involved. The Dean of the Medical School testified that the payment of stipends, such as paid to taxpayers here, provides the necessary economic support for young physicians to pursue the advanced training programs offered by UAMC.

In each case the jury responded affirmatively to an interrogatory asking whether the payments in question were "scholarship or fellowship grants within the meaning of the Internal Revenue law and regulations." The trial court, in refusing to set aside this verdict, ruled the evidence sufficient to show:

\* \* \* that the Medical Center's purpose in accepting doctors for its residency programs is to train them

as specialists hoping that they will remain in Arkansas to help meet the great shortage of medical professionals here; that Dr. Leathers' and Dr. Blankenship's personal objectives during the years in question were to further their education and to be trained as specialists; that the payments made to them were made to allow them to pursue studies and advance their training in their individual capacities; that any services rendered to the Medical Center or to patients by the two doctors were only incidentally of benefit to the Medical Center; and that the payments did not represent compensation for services rendered.

I reject this analysis. The "primary purpose" test as reflected in the ruling of the trial court is not determinative of the taxability of the stipends received by Drs. Leathers and Blankenship. I would hold that these stipends did not qualify for favorable tax treatment as fellowships under 26 U.S.C. § 117 and the Treasury Regulations supplementing this section since, under the facts not in dispute, the amounts in question represent "compensation for \* \* \* present \* \* \* employment services" or "payment for services which are subject to the direction or supervision of the grantor" within the meaning of Regulation § 1.117–4(c).[1] I make my analy-

1. The relevant text of Treas.Reg. on Income Tax (1954 Code), 26 CFR § 1.117–4 reads:

§ 1.117–4 Items not considered as scholarships or fellowship grants.

The following payments or allowances shall not be considered to be amounts received as a scholarship or a fellowship grant for the purpose of section 117:

\* \* \* \* \*

(c) *Amounts paid as compensation for services or primarily for the benefit of the grantor.* (1) Except as provided in paragraph (a) of § 1.117–2, any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research, *if such amount represents either compensation for past, present, or future employment services or represents payment for services*

*which are subject to the direction or supervision of the grantor.*

(2) Any amount paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research primarily for the benefit of the grantor. However, amounts paid or allowed to, or on behalf of, an individual to enable him to pursue studies or research are considered to be amounts received as a scholarship or fellowship grant for the purpose of section 117 if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for the services described in subparagraph (1) of this paragraph. Neither the fact that the recipient is required to furnish reports

sis in light of Bingler v. Johnson, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 645 (1969), and its construction of § 117 and the applicable Treasury Regulations.[2]

Historically, under the 1939 Code, scholarships and fellowships had not been given special treatment under a separate subject classification. Payments in furtherance of a taxpayer's education which were claimed excludable were examined under the test of "gift" versus "compensation." *See* Stone v. Commissioner, 23 T.C. 254 (1954). This made taxability determinable only on a case-by-case method, a procedure Congress desired to end by the passage of § 117 of the Internal Revenue Code of 1954. *See* Bingler v. Johnson, *supra*, 394 U.S. at 752–753, 89 S.Ct. 1439, 22 L.Ed. 2d 695.

In enacting § 117, Congress did not specifically designate those grants subject to favorable tax treatment from those not so favored. As the Supreme Court observed:

> * * * Congress was merely "recogni[zing] that scholarships and fellowships are sufficiently unique . . . to merit [tax] treatment separate from that accorded gifts," and attempting to provide that grants falling within those categories should be treated consistently—as in some instances, under the generic provisions of the 1939 Code, they arguably had not been. Delineation of the precise contours of those categories was left to the Commissioner. [*Id.* at 753, 89 S.Ct. at 1446 (footnotes omitted).]

Treasury Regulation § 1.117 at least superficially accomplished the congressional purpose of eliminating the old "gift" versus "compensation" test, but

squaned at least three basic approaches in its place: the "primary purpose" test, the "indicia of compensation" test, and a third test which was a combination of the other two.[3] The "primary purpose" approach came from the language of Treasury Regulation § 1.117–4(c)(2) which excludes from scholarship or fellowship treatment amounts paid to an individual to enable him to pursue "studies or research primarily for the benefit of the grantor." *See* Ussery v. United States, 296 F.2d 582 (5th Cir. 1961). This regulation also recites the converse proposition, permitting the exclusion from gross income "if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity and the amount provided by the grantor for such purpose does not represent compensation or payment for * * * services * * *."

In the "indicia of compensation" test, the court examines the grant to see if it carries characteristics usually associated with compensation, Stewart v. United States, 363 F.2d 355 (6th Cir. 1966). Finally, in some instances, courts have combined both tests, "primary purpose" and "indicia of compensation," to determine the taxability of the grant. Woddail v. Commissioner, 321 F.2d 721 (10th Cir. 1963). *See* Evans v. Commissioner, 34 T.C. 720 (1960).

Against this background of varying approaches, the Supreme Court decided Bingler v. Johnson, *supra*, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695. Unlike the situation here, the taxpayers in *Bingler* were performing no present services for the grantor-employer. Taxpayers, who were engineers at the Bettis

---

of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant. [Emphasis in (c) (1) added.]

2. For a pre-*Bingler* summary, *see* Tabac Scholarships and Fellowship Grants: An

Administrative Merry-Go-Round, 46 Taxes 485 (1968). For post-*Bingler* discussions, *see* Hutton, Scholarships and Fellowships: What's in a Name?, 56 A.B. A.J. 592 (1970); 7 San Diego L.Rev. 154 (1970); 35 Missouri L.Rev. 393 (1970); 31 Ohio State L.J. 186 (1970).

3. *See* 31 Ohio State L.J. 186 (1970).

Atomic Power Laboratory operated by Westinghouse, received stipends through a Westinghouse "fellowship" program while they were on leave pursuing an advanced course of study. Taxpayers had made an agreement with Westinghouse to submit written progress reports during their advanced study and to return to active employment for at least two years following the educational leave. In resolving the issue of whether the stipends were scholarships or fellowships, the Court focused on the "compensation" provision of Regulation § 1.117–4(c) and determined that it was not "'unreasonable or plainly inconsistent with the . . . statut[e]'.'" *Id.* at 755, 89 S.Ct. at 1447. The Court also noted that the definitions provided by the Regulation comported with the ordinary understanding of "scholarships" and "fellowships" as "relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." *Id.* at 751, 89 S.Ct. at 1445.

The Court concluded that the payments were not excludable from income because:

[M]ost importantly, Westinghouse unquestionably extracted a *quid pro quo.* The respondents not only were required to hold positions with Westinghouse throughout the "work-study" phase of the program, but also were obligated to return to Westinghouse's employ for a substantial period of time after completion of their leave. The thrust of the provision dealing with compensation is that bargained-for payments, given only as a *"quo"* in return for the *quid* of services rendered—whether past, present, or future—should not be excludable from income as "scholarship" funds. [*Id.* at 757–758, 89 S.Ct. at 1448–1449 (footnotes omitted).]

Significantly, the Court omitted any mention of "primary purpose" as a consideration in resolving the issue, and the Court's comments, which I quote below, cast considerable doubt upon the vitality of the "primary purpose" test in cases of this nature:

We accept the suggestion in the Government's brief that the second paragraph of Treas.Reg. § 1.117–4(c) —which excepts from the definition of "scholarship" any payments that are paid to an individual "to enable him to pursue studies or research primarily for the benefit of the grantor"—is merely an adjunct to the initial "compensation" provision: "By this paragraph, the Treasury has supplemented the first in order to impose tax on bargained-for arrangements *that do not create an employer-employee relation, as, for example, in the case of an independent contractor.* [Emphasis added.] But the general idea is the same: 'scholarship' or 'fellowship' does not include arrangements where the recipient receives money and in return provides a *quid pro quo.*" Brief for Petitioner 22. [*Id.* at 758 n. 32, 89 S.Ct. at 1449.]

The Court's footnote implies that the "primary purpose" rationale applies to a nonemployee relationship only, thus removing from primary-purpose considerations a relationship which presents the ordinary elements of an employer-employee arrangement, such as grantor supervision and control of services performed and payment by the grantor of an agreed upon stipend. In any event, I construe this language of *Bingler* to mean that the "primary purpose" test is secondary to "compensation" aspects of the relationship between grantor-payor and payee-taxpayer.

An examination of the relationship between the resident doctors and UAMC reveals that this relationship contained many of the indicia that are ordinarily associated with an employer-employee arrangement. First, the doctors were required to perform numerous valuable medical services for UAMC. Although these services allegedly *could* have been performed by staff doctors, that does not alter the fact that they *were* performed by residents, thus freeing staff

doctors from devoting their time to these tasks. The services rendered were valuable to UAMC and the affiliated hospitals both in providing health care to patients and in providing education to others in the medical training hierarchy, such as undergraduates, interns, and less experienced residents. Secondly, UAMC retained the right to control and direct all work performed by the residents. Thirdly, UAMC did not pay residents on the basis of need, but on the basis of a flat, fixed sum, which increased yearly as the resident attained additional skill and experience. Finally, UAMC made the payments to all physicians whom it accepted as residents, and it expected all residents in turn to perform certain services. Under these circumstances, I think that an employer-employee relationship was clearly established and the payments constituted compensation for services rendered rather than no-strings-attached fellowship grants. I am satisfied that where an *employment relationship* exists between an educational institution and its student, the motives of each do not become crucial in determining the tax status of the payments made by the school. I find support for this view in a decision of the Fourth Circuit, Hembree v. United States, 464 F.2d 1262 (1972), which held that stipends paid under circumstances similar to those found here did not qualify as fellowships and thus could not be excluded from gross income. In that case the district court had determined that the payments were nontaxable since they were made for the purpose of furthering the taxpayer's education and training. The district court based its conclusion upon a finding that the primary purpose of the Medical College of South Carolina was the training of physicians rather than the treatment of patients.

The Fourth Circuit opinion by Judge Field observed:

> On the facts of this case, however, we conclude that the district court erred in using the primary purpose of the hospital facility as the criterion for the test enunciated in the Regulations. It is not the purpose of the facility to which the Regulation refers but the primary purpose of the payment made to the taxpayer that is controlling. * * * The arrangements under which Dr. Hembree served that portion of his internship and residency at MCSC had all of the indicia of an employer-employee relationship, and differed in no material respect from his service at the VA and County hospitals. [*Id.* at 1264.]

The court added:

> There is another and more compelling reason for holding the subject payments taxable. The regulations require that in order to qualify for exclusion the payments must be made for the primary purpose of furthering the education and training of the recipient, and, additionally, the amount provided for such purpose shall not represent compensation or payment for services. In considering and sustaining the validity of Treasury Regulation 117–4(c) in Bingler v. Johnson, 394 U.S. 741 [,89 S.Ct. 1439, 22 L.Ed. 2d 695] (1969), the Supreme Court bypassed discussion of the "primary purpose" dialogue and bluntly stated that "the definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of 'scholarships' and 'fellowships' as relatively disinterested, 'no-strings' educational grants, with no requirement of any substantial *quid pro quo* from the recipients." The clear import of this language is that if there is any substantial *quid pro quo,* i. e., compensation for services, the payments cannot qualify for exclusion from income as "fellowship" funds. [*Id.* at 1265.]

Pre-*Bingler* decisions sometimes arrived at opposing answers to the question of whether payments to resident physicians pursuing advanced studies should be deemed excludable from

income.[4] However, the post-*Bingler* decisions called to our attention have uniformly and consistently held that payments made to medical residents and to interns who perform medical services do not qualify for exclusion from gross income as fellowships or scholarships within the meaning of § 117. *See, e. g.,* Hembree v. United States, *supra,* 464 F. 2d 1262; Wertzberger v. United States, *supra,* 441 F.2d 1166; Quast v. United States, *supra,* 428 F.2d 750; Tobin v. United States, 323 F.Supp. 239 (S.D. Tex.1971); Kwass v. United States, 319 F.Supp. 186 (E.D.Mich.1970).[5]

Since the salient facts clearly establish a *"quid pro quo,"* the motivation of the parties is not controlling; thus, I believe we are required to reverse the judgment of the district court and direct that each taxpayer's cause be dismissed.[6] *See* Wertzberger v. United States, *supra,* 441 F.2d 1166; Ward v. Commissioner, 449 F.2d 766 (8th Cir. 1971); Quast v. United States, *supra,* 428 F.2d 750.

But even if motivation were relevant, I find that the evidence in this case does not justify a finding that the stipend qualified as a scholarship or fellowship under the *primary purpose* criteria of Treasury Regulation § 1.117–4(c)(2).

In discussing the evidence which it finds conflicting and thus justifying submission of the case to the jury, the majority indicates that the primary purpose of UAMC is the education and training of medical personnel. As has been previously discussed, the *Hembree* court specifically held that this was an irrelevant factor in applying the primary purpose test enunciated in the Regulation. The majority also states that the residents are closely supervised and are not required to remain in the state upon completion of the residency. But the Regulations state that "a payment for services which are *subject to the direction and control of the grantor"* are not excludable from gross income and both the Regulations and *Bingler*

---

4. For stipends held includable in gross income, *see, e. g.,* Proskey v. Comm'r, 51 T. C. 918 (1969); Taylor v. United States, 22 AFTR 2d 5246 (E.D.Ark.1968); Lingl v. Charles, 21 AFTR 2d 410 (S.D. Ohio 1967); Woddail v. Comm'r, 321 F. 2d 721 (10th Cir. 1963); Bonn v. Comm'r, 34 T.C. 64 (1960).

For stipends held excludable from gross income, *see, e. g.,* Pappas v. United States, 19 AFTR 2d 1276 (E.D.Ark.1967); Wrobleski v. Bingler, 161 F.Supp. 901 (W.D.Pa.1958). *Cf.* Wells v. Comm'r, 40 T.C. 40 (1963).

5. *Accord,* Taylor v. Comm'r, 31 CCH Tax Ct.Mem. 57, T.C.Memo 1972–20 (1972); Calick v. Comm'r, 31 CCH Tax Ct.Mem. 69, T.C.Memo 1972–23 (1972); Birnbaum v. Comm'r, 30 CCH Tax Ct.Mem. 989, T. C.Memo 1971–231 (1971); Steinhaus v. Comm'r, 30 CCH Tax Ct.Mem. 1197, T.C. Memo 1971–279 (1971); Rundell v. Comm'r, 30 CCH Tax Ct.Mem. 177, T.C. Memo 1971–40 (1971), aff'd, 455 F.2d 639 (5th Cir. 1972); Emory v. Comm'r, 30 CCH Tax Ct.Mem. 785, T.C.Memo 1971–. 191 (1971); Fuller v. Comm'r, 30 CCH Tax Ct.Mem. 1116, T.C.Memo 1971–259 (1971); Fisher v. Comm'r, 56 T.C. 1201 (1971); Anderson v. Comm'r, 54 T.C. 1547 (1970); Coggins v. United States, 26 AFTR 2d 70–5775 (N.D.Tex.1971);

Dimants v. Comm'r, 29 CCH Tax Ct. Mem. 1138, T.C.Memo 1970–257 (1970); Katz v. Comm'r, 29 CCH Tax Ct.Mem. 511, T.C.Memo 1970–116 (1970); Ballerini v. Comm'r, 29 CCH Tax Ct.Mem. 1595, T.C.Memo 1970–334 (1970); Flicker v. Comm'r, 29 CCH Tax Ct.Mem. 1115, T.C.Memo 1970–252 (1970). *Cf.* Moll v. Comm'r, 57 T.C. 579 (1972); Utech v. Comm'r, 55 T.C. 434 (1970); MacDonald v. Comm'r, 52 T.C. 386 (1969).

6. This is not to say that stipends paid medical residents will never qualify as an exclusion from income. An example of an approved fellowship exclusion for a resident doctor was noted in *Wertzberger, supra,* 315 F.Supp. 34, 37 n. 3:

For a factual situation which permits a § 117 exclusion for physicians engaged in post-graduate study, *see* Revenue Ruling 57–560, 1957–2, Cum.Bull. 108. There, physicians studying under the auspices of the Mayo Foundation and Mayo Properties Association received actual fellowship grants and cost-of-living allowances, but "render[ed] no service, replace[d] no personnel who would be employed on a salary basis, and perform[ed] no functions for the benefit of the grantor or training institution * * *."

explicitly state that these services may be rendered presently as well as in the future.

Finally, the majority calls particular attention to testimony of the Dean of the School of Medicine who expressed the opinion that with "rearrangement" the faculty could "take care of the patients without the residents" and contrasted this testimony with that of the Director of the Veterans Administration Hospital in Little Rock who testified that the Medical staff could not handle the patient load without the help of residents. I do not agree with the majority's characterization of this evidence as conflicting. The only inference that I draw from this testimony is that residents at both facilities performed vital and necessary tasks in patient care; to provide the needed services without the aid of the residents would require in one case more staff services, and in the other, more staff members.

What I believe to be revealing in the Dean's testimony is his disclosure that neither economic need nor scholastic attainments of the residents govern the eligibility to receive or the amount of the stipend. This is in sharp contrast to the hospital's graduate scholarship program in which need and academic standing are important considerations in the awarding of the scholarship.

In sum, as I view the evidence, the verdict can be justified only if the purpose of the institution becomes a relevant and crucial subject of inquiry. Such purpose is immaterial to the issue. Accordingly, I find no justification for the jury verdict upon a "primary purpose" approach.

I add two additional comments. First, the result of the majority opinion is to permit disparate tax treatment to similarly situated resident doctors. In *Wertzberger, supra,* 441 F.2d 1166, we affirmed Judge Oliver's holding that payments received by a resident physician at the University of Kansas Medical Center constituted compensation for services and did not qualify for exclusion from gross income under § 117. Now, the court affirms the finding in the trial court that payments received by a resident physician at the University of Arkansas Medical Center under virtually identical circumstances can be excluded as a fellowship grant under § 117. Under the majority view another resident physician at UAMC could be held liable for taxes upon all of the stipend paid him contrary to the tax treatment afforded taxpayers here. The effect of the court's decision is to return to the pre-§ 117 case-by-case determination of the grantor's motives, *Bingler, supra,* 394 U.S. at 752, 89 S.Ct. 1439, 22 L.Ed.2d 695, thus frustrating the congressional intent to provide consistent tax treatment by its enactment of § 117.

Secondly, contrary to the majority's implication that these taxpayers fall within the terms of § 117, I believe that the Court's statement in regard to the alleged scholarships in *Bingler* is applicable:

> One may justifiably suppose that the Congress that taxed funds received by "part-time" teaching assistants, presumably on the ground that the amounts received by such persons really represented compensation for services performed, would also deem proper a definition of "scholarship" under which comparable sorts of compensation—which often, as in the present case, are significantly greater in amount—are likewise taxable. [*Id.* at 754, 89 S.Ct. at 1447 (footnotes omitted).]

I strongly dissent from the action of the majority in this case, for its precedent can only serve to widen a "tax-break" beyond the dimensions intended by Congress and to make it virtually impossible for resident physicians to know without litigation whether they owe taxes upon stipends paid them by the institutions in which they train.