Harris C. **CRIMMINS,** Ruth Crimmins, Ruben Oster, Donna Oster, Elmer Gullickson, Lucille Gullickson, Appellees,

v.

**UNITED STATES of America,**
**Appellant.**

No. 80–1770.

United States Court of Appeals,
Eighth Circuit.

Submitted May 21, 1981.

Decided July 24, 1981.

---

M. Carr Ferguson, Asst. Atty. Gen., Michael L. Paup, William A. Friedlander, James A. Riedy (argued), Attys., Tax Div., Dept. of Justice, Washington, D. C., for appellant; James R. Britton, U. S. Atty., Fargo, N. D., of counsel.

Eugene A. Lalonde, Billings, Mont., for appellee.

Before HEANEY and BRIGHT, Circuit Judges, and HARRIS, Senior District Judge.[*]

BRIGHT, Circuit Judge.

Harris and Ruth Crimmins, Ruben and Donna Oster, and Elmer and Lucille Gullickson (taxpayers) brought this action in federal district court to secure refunds of federal income taxes for the 1973 tax year. The Government now appeals from the district court [1] judgment entered in favor of taxpayers. We affirm.

I. *Background.*

Taxpayers, who report their income taxes on a calendar year, cash basis, raise beef cattle in North Dakota. Because of adverse economic conditions in late 1973, the taxpayers oversold their normal years' produce by entering into "Installment Deferred Payment Contract[s]" with Missouri Slope Livestock Auction, Inc. (Missouri Slope), a livestock marketing agency then owned

---

[*] OREN HARRIS, United States Senior District Judge for the Eastern and Western Districts of Arkansas, sitting by designation.

[1] The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota.

solely by Jerry Boren.[2]   Each of these identical contracts[3] named the taxpayer as "seller" and Missouri Slope or Boren as "buyer."   The price received at Missouri Slope's auction of the cattle, less the buyer's commission and expenses, determined the purchase price.   Each contract unconditionally deferred payment of the purchase price until approximately January 4, 1974.[4]

Several days after executing the deferred payment contracts, the taxpayers delivered their cattle to Missouri Slope's stockyard. Missouri Slope sold the cattle at auction approximately a day later.   Missouri Slope placed the proceeds from these sales in its custodial account and then transferred the funds to its expense account, Boren's general checking account.   With these proceeds, Boren purchased certificates of deposit in the name of Missouri Slope Livestock Auction Custodial Account.   In early 1974, Boren cashed the certificates of deposit and paid the taxpayers with checks drawn on his expense account.

Taxpayers reported any gain recognized from the sale in the 1974 tax year.   After auditing the taxpayers, the Commissioner of the Internal Revenue Service (the Commissioner) determined that because Missouri Slope acted as taxpayers' agent, not as an outright purchaser, taxpayers constructively received the income in 1973.   Accordingly, the Commissioner adjusted the taxpayers' 1973 and 1974 income tax returns, resulting in substantial increases in taxpayers' income for 1973 and drastic reductions and even losses for 1974.   The Commissioner then assessed deficiencies of $4,205.31,

$4,861.85, and $5,687 against the Crimmins, the Osters, and the Gullicksons, respectively.

After paying the deficiencies, the taxpayers brought a tax refund suit in district court.   After a trial without a jury, the court determined that a bona fide sale occurred between the taxpayers and Missouri Slope, and, therefore, the taxpayers did not receive the income from these sales until 1974.   Accordingly, the court ordered the Government to refund the assessed deficiencies with interest.   *Crimmins v. United States,* 80–2 U.S.Tax Cas. (CCH) ¶ 9542, 46 A.F.T.R.2d (P–H) 80–5422 (D.N.D.1980).

The Government appeals, essentially contending that Missouri Slope, as "middleman" between the ranchers and the ultimate purchasers, merely acted as the taxpayers' agent/consignee and, therefore, the Commissioner properly assessed tax deficiencies against the taxpayers.   We conclude that the record supports the district court's finding of a bona fide sale and, accordingly, we affirm.

### II.   *Discussion.*

In assessing tax deficiencies, the Commissioner relied on Section 451(a) of the Internal Revenue Code of 1954, and Treasury Regulations §§ 1.451–1 and 1.451–2.   Section 451(a) simply provides that a cash, calendar-year basis taxpayer must report an item of income in the taxable year in which received.[5]   Under Treas.Reg. § 1.451–1 tax-

---

2.   The Crimmins' sale of 173 calves and steers on October 17, 1973, ran to Missouri Slope Livestock Auction, Inc.   The Osters' sale of 98 steers and heifers on December 14, 1973, ran to Jerry Boren.   The Gullicksons' sale of 10 calves on October 6, 1973, ran to Missouri Slope Livestock Auction; their sale of 80 calves on November 4, 1973, ran to Missouri Slope Livestock Auction, Inc.

3.   According to Jerry Boren's deposition, the Livestock Market Association of Kansas City, Missouri, prepared these form contracts.   Jerry Boren's deposition was introduced into evidence because he had died by the time of trial.

4.   The pertinent portion of each contract provided:

> Seller hereby agrees to accept and the buyer hereby agrees to pay to the seller for said livestock a sum equal to the market value of said livestock as determined by the buyer from buyer's sale of the cattle on ___(date)___; and payment to the seller shall be made on the 4th day of January, 1974 or within 5 days thereafter.
> Seller shall have no claim to receive payments before said dates.

5.   I.R.C. § 451(a) provides:

> The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpay-

payer must report income "constructively received," even though not actually received. Constructive receipt of income is defined by Treas.Reg. § 1.451–2(a), which provides:

> Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions.

Literally, Treas.Reg. § 1.451–2 does not require taxpayers' inclusion of the income in their 1973 tax returns because taxpayers neither received[6] nor were entitled under the contract to receive the income in 1973. Under the regulation, however, receipt of income by an agent must be treated as receipt by the principal, even though the agent specifically agrees not to distribute the income to the principal until the following year. *Warren v. United States*, 613 F.2d 591 (5th Cir. 1980); *United States v. Pfister*, 205 F.2d 538 (8th Cir. 1953).

The sole issue presented on this appeal concerns the relationship between Missouri Slope and taxpayers in entering into these deferred payment contracts. If, as the Government contends, Missouri Slope acted as taxpayers' agent/consignee in holding the proceeds, the taxpayers are not entitled to a tax refund. If, however, the parties intended a bona fide sale of the cattle, rather than a consignment, the district court must be affirmed.

Whether the parties intended a sale or a consignment of the cattle presented a question of fact to be determined by the trier of fact, in this case, the court. *See Kasper v. Banek*, 214 F.2d 125 (8th Cir. 1954); *McIntyre v. United States*, 1 A.F.T. R.2d (P–H) 1100 (D.N.D.1958). Therefore, the district court's determination that the parties entered into a bona fide sale agreement must be upheld if supported by substantial evidence in the record.[7] *See Leathers v. United States*, 471 F.2d 856, 858 (8th Cir. 1972), *cert. denied*, 412 U.S. 932, 93 S.Ct. 2754, 37 L.Ed.2d 161 (1973). After carefully reviewing the record, we conclude that the evidence supports the district court's finding.[8]

In determining that the taxpayers and Missouri Slope entered into a bona fide sale agreement, the district court relied primarily on the language of the contract. The court found that the agreement effected a clear transfer of title and risk of loss on the date of delivery. The court further concluded that under North Dakota law, an open price does not defeat a sale, if the contract sets forth a clear procedure for ascertaining the exact dollar amount of the purchase price. *See* N.D.Cent.Code § 41–02–22 (1968).

---

er, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

6. The Osters' children did receive $4,675 of the proceeds in 1973. This distribution, however, did not constitute income to the taxpayers because these cattle, a gift made by the Osters to their children, were mistakenly included in the deferred payment contract.

7. The Government urges the court to adopt a *per se* rule of law that cattle marketing agencies may never act as purchasers in deferred payment contracts, because such agencies necessarily act as "middlemen" between ranchers and ultimate purchasers. We decline to adopt such a position. The IRS has permitted farm-

ers to sell their crops to grain elevators and defer the receipt of income. *See* Rev.Rul. 73–210, 1973–1 C.B. 211; Rev.Rul. 58–162, 1958–1 C.B. 234. We perceive no basis for distinguishing cattle marketing agencies from grain elevators, which also act as "middlemen" between farmers and third parties.

8. We note that one other district court has approved a deferment sale to a cattle marketing agency. *See Levno v. United States*, 440 F.Supp. 8 (D.Mont.1977). Pursuant to a settlement agreement, the Commissioner dismissed the appeal in *Levno*, but has maintained that *Levno* was wrongly decided. *See* Rev.Rul. 79–379, 1979–2 C.B. 204.

On appeal, the Government contends that if we apply the "substance over form" rule of tax law, *see Commissioner of Internal Revenue v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945), we must conclude that the parties intended consignments, rather than sales, of the livestock. The Government argues that the transactions in question pattern standard consignments in which the marketing agency sells the cattle at an auction sale and turns over the sale proceeds to the rancher, after deducting commissions and expenses. The Government contends that the marketing agency, like a consignee, bore no risk of loss on the transactions because it received commissions and expenses, regardless of the auction price, and could have returned the cattle to the ranchers if events precluded their sale at auction. The Government also asserts that Missouri Slope's business records, which treated the transactions as consignments, demonstrate Missouri Slope's intent to act as consignee. Finally, the Government argues that no sale could have occurred because neither Missouri Slope nor Boren were licensed as "dealers" in 1973 [9] and thus were precluded from purchasing cattle under the Packers and Stockyards Act, 7 U.S.C. §§ 181 *et seq.* (1976).

We recognize that the Government has presented evidence from which the trier of fact might have found that no bona fide sale occurred. We must nevertheless conclude that sufficient dispute existed in the evidence and its inferences to support the district court's finding that taxpayers and Missouri Slope intended sales of the livestock to Missouri Slope. The language of the contracts as well as testimony by taxpayers and Boren evidenced their intent to enter into sales agreements. Taxpayers testified that drought and market conditions forced them to oversell their normal years' produce to Missouri Slope. Boren stated that he bought the cattle outright to acquire business that might have gone elsewhere.[10] The mere similarity of these transactions to consignment agreements did not conclusively rebut this evidence that the parties intended outright sales of the cattle to Missouri Slope.[11]

We also reject the Government's argument that Missouri Slope's treatment of the transaction as a consignment requires a reversal of the district court.[12] Taxpayers exercised no control over Missouri Slope's internal bookkeeping methods and, therefore, these records are not conclusive on the issue of taxpayers' intent. Moreover, Boren treated the deferred payment contracts differently than ordinary consignments. He segregated these funds from consignment proceeds, purchased certificates of deposit with the funds, and paid taxpayers from his personal expense account.[13]

■ We find some merit in the Government's argument that the Packers and Stockyards Act required Boren or Missouri Slope to be licensed as a dealer in 1973 in

---

9. Jerry Boren registered as a dealer in 1974.

10. Taxpayers testified that if Missouri Slope had not bought the cattle on a deferred payment basis, they would have sold the cattle elsewhere. The Government conceded that it would have approved deferred payments sales to meatpacking plants or order buyers.

11. The contracts did not specify the obligations of the taxpayers or Missouri Slope in the event Missouri Slope was prevented from selling the cattle at auction. We reject, therefore, as speculative the Government's argument that Missouri Slope bore no risk of loss because the failure to sell at auction made the contract nonexecutable.

12. Check-in slips, scale tickets, and market clearances indicated taxpayers as owners of the cattle. Missouri Slope's financial records listed taxpayers as consignors and its application for a livestock bond indicated as proceeds payable to consignees, the amount held pursuant to the deferred payment contracts.

13. We also note that listing the taxpayers as sellers on check-in slips, scale tickets, and market clearances did not necessarily demonstrate Missouri Slope's intent to treat the transactions as consignments. Truck drivers who delivered the cattle often filled out the check-in slips. These drivers, of course, were not aware of the sales agreements with Missouri Slope. Moreover, by listing the taxpayers as sellers on scale tickets and market clearances, the auctioneer could tell ultimate purchasers where the cattle were raised.

order to purchase cattle from these taxpayers. As an expert from the Packers and Stockyards Agricultural Marketing Service testified, however, the Act does not void purchases that are illegal solely because unlicensed. We conclude that, even if these sales violated the Act, such a violation does not require a reversal of the district court's determination that the taxpayers and Missouri Slope intended to enter into contracts of sale.

Accordingly, we conclude that the record supports the district court's finding of a bona fide sale and, therefore, affirm the district court judgment awarding the Crimmins a tax refund of $4,205.31, the Osters a refund of $4,861.85, and the Gullicksons a refund of $5,687.